# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 02-3844 & 02-3997

RAYMOND ZIMMERMAN, INDIVIDUALLY
AND ON BEHALF OF A CLASS OF SIMILARLY
SITUATED SOYBEAN FARMERS, ET AL.,

*Plaintiffs-Appellants, Cross-Appellees,*

*v.*

CHICAGO BOARD OF TRADE, PATRICK H. ARBOR,
THOMAS R. DONOVAN, ET AL.,

*Defendants-Appellees, Cross-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 89 C 8467—**Wayne R. Andersen**, *Judge.*

_____

ARGUED SEPTEMBER 25, 2003—DECIDED FEBRUARY 9, 2004

_____

Before CUDAHY, RIPPLE and KANNE, *Circuit Judges.*

CUDAHY, *Circuit Judge.* This appeal represents what may
be the last chapter in a story that began more than ten
years ago, when the Chicago Board of Trade (CBOT) issued

an Emergency Resolution (the Resolution), which, according to the plaintiffs, depressed the price of soybeans sold in the July 1989 cash market. Only four months later world history took a turn as the Berlin Wall fell. The cold war was over but the "soy war" had just begun.

The plaintiffs in this action are a class of soybean farmers who sold their soybeans during the period of allegedly depressed prices in July 1989. The plaintiffs argue that the CBOT violated antitrust laws by adopting the Resolution, not for proper regulatory purposes but instead out of self-interest and to protect a politically powerful member of the CBOT. After twelve days of jury trial, the district court granted the CBOT's Rule 50(a) motion for judgment as a matter of law, finding that the plaintiffs failed to present a legally sufficient evidentiary basis for a reasonable jury to find that the CBOT's dominant motive for issuing the Resolution was held in bad faith. This appeal followed. After reviewing the record, we find ourselves in agreement with the district court, and we therefore affirm.

# I. BACKGROUND

Because our task is to determine whether there is sufficient evidence in the record for a jury to find for the plaintiffs, we must review the evidence in the record which might support such a finding. Therefore, although not exhaustive, our recitation of the facts is necessarily lengthy.

## 1. Introduction

On July 11, 1989, the CBOT publicly issued an Emergency Resolution requiring all holders of positions in the July 1989 soybeans futures contract to reduce their positions to three million bushels as of the close of trading on July 18, 1989, and to further reduce their positions to one million bushels as of the expiration of trading in the

July contract on July 20. App. at 897.[1] According to the plaintiffs' expert, this public liquidation of the July 1989 soybeans contracts disrupted the market, contributing to a 39.5-cent drop in the price of the July 1989 soybean futures contract on July 12, and correspondingly causing a 25-cent drop in the cash price of a bushel of soybeans through the rest of July 1989. App. at 372, 385-88, 507-08.

This lawsuit has been before us on two previous occasions. In 1992, we found that the defendants did not have antitrust immunity because the Commodities Futures Trading Commission (CFTC or the Commission) never formally approved the Resolution. *See American Agric. Movement v. Board of Trade*, 977 F.2d 1147, 1167 (7th Cir. 1992) (AAM). In 1995, we found that the plaintiffs' complaint should not have been dismissed for lack of antitrust standing. *See Sanner v. Board of Trade*, 62 F.3d 918, 930 (7th Cir. 1995). Since that time, the case was certified as a class action, the district court denied the defendants' summary judgment motion and a jury trial commenced on September 18, 2002, before the Honorable Wayne R. Andersen. After the plaintiffs rested their case on September 30, the defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The district court did not then rule on the motion and allowed the defendants to proceed with their case.

On October 10, the trial court granted the defendants' Rule 50(a) motion from the bench, holding that there was insufficient evidence for a reasonable jury to return a verdict that the defendants' dominant motive was held in bad faith. App. at 793-815. At that time, the seven defendants were: the CBOT; five members of the CBOT's Board of

---

[1] The joint appendix in this case will be designated as "App." while the transcript will be designated as "Tr."

Directors (Chairman Karsten Mahlmann, Vice Chair Patrick Arbor, President Thomas Donovan and Directors Hal Hansen, and Glen Hollander); and the Chairman of the CBOT's Business Conduct Committee (Wallace Weisenborn).

### 2. *The Market For Soybeans*

The following facts were elicited at trial. Every year, American farmers plant soybeans in the spring and harvest them in the fall. Soybeans are often stored and sold during the period between crop harvests. The plaintiff farmers are those who harvested their soybeans in the fall of 1988 and held onto the beans for sale in the summer of 1989, when prices were predicted to be higher.[2] App. at 336. Almost the entire annual American soybean crop is ultimately purchased by a handful of commercial firms, including Cargill and Archer Daniels Midland, generally known as "commercials." App. at 312-14. Commercial firms acquire soybeans to process them into oils or meal, or for purposes of export. App. at 307, 312-13.

In addition to commerce in soybeans themselves, which is known as the cash market, there is also commerce in contracts for the future purchase and sale of soybeans (the futures market). Under the terms of CBOT soybean futures contracts, one party, commonly known as a "short," agrees to make delivery of soybeans during a specified delivery month, while the other party, commonly known as a "long," agrees to pay for the beans and take delivery of them during the delivery month. If the futures price declines, the short benefits financially while the long suffers a commen-

---

[2] Because of a drought, the 1988 soybean crop was small, approximately 1.8 billion bushels—about ten percent below normal. Soybean futures prices trading in the summer of 1988 for delivery the following summer approached $10 a bushel. App. at 313, 504-05.

surate loss. App. at 191-92. Every day, CBOT member firms known as "clearing firms" mark contract holders' positions to market, such that fluctuations in futures prices are credited to or debited from customers' accounts daily. App. at 192, 309-10. Clearing firms also serve as guarantors of contract performance because they must perform if their customers cannot. App. at 310-11.

In 1989, more than 90% of all soybean futures contracts were traded on the CBOT. App. at 308-09. The CBOT is a futures exchange, authorized as a "contract market" and regulated by the CFTC pursuant to the Commodities Exchange Act (CEA). App. at 617. The CEA imposes on CBOT regulatory responsibility for the markets conducted under its auspices, subject to CFTC oversight. App. at 615-16. The CBOT is governed by its Board of Directors and also has a Business Conduct Committee (BCC), which is responsible for monitoring exchange members' financial compliance, for maintaining liquid markets and for ensuring orderly liquidation of expiring contracts. App. at 225-27, 556.

CBOT soybean futures contracts are traded with respect to seven separate delivery months during the year, including the last months of the old crop in May, July, August and September, followed by November contracts representing the new crop. App. at 320. The futures contracts expire during the delivery month. Prior to a contract's expiration, it can be canceled by purchases of offsetting contracts, but futures contracts held at a contract's expiration require delivery for performance.[3]

---

[3] A short has the contractual right to make delivery at any time during the delivery month. App. at 321. Trading in an expiring contract ceases approximately seven business days before the end of the month. This period after the end of trading was adopted in the 1930s to give shorts sufficient days after the end of trading in a contract to arrange for transportation and delivery. App. at 322.

A CFTC requirement limits a firm's soybean futures position to three million bushels, but the CFTC is authorized to exempt individual commercial firms from this requirement as to any one month's contract because commercial firms have large needs for physical soybeans for processing and export. App. at 317-18. These exemptions or "anticipatory hedges" are issued by the CFTC and require holders of such positions to substantially liquidate their positions five days prior to the contract's expiration. App. at 319, 523. The purpose of this federal regulatory requirement is to promote orderly liquidation by making sure that holders of anticipatory hedges do not hold all their contracts until the expiration date. App. at 670- 72.

The rule is also aimed at preventing a corner on the market. A corner occurs when a trader secretly acquires a long futures position, very large relative to the physical supply that is available to be delivered, and simultaneously acquires the means, by ownership or otherwise, to prevent delivery at reasonable prices of the physical commodity, thereby "squeezing" the shorts that must make delivery.[4] App. at 519-20.

### 3.   Cargill and Ferruzzi

Cargill, a large privately held corporation and member of the CBOT, began acquiring a short position in the expiring May 1989 soybean contract during the first week of May 1989. App. at 357. Cargill lost money on this position and may have blamed its losses upon an Italian competitor, Ferruzzi Finanziaria, S.p.A. (Ferruzzi). In 1988, Ferruzzi had bought the American soybean processor Central Soya,

---

[4]  For more information about futures trading and the CBOT, *see* Roberta Romano, *A Thumbnail Sketch of Derivative Securities and Their Regulation*, 55 Md. L. Rev. 1 (1996).

and thus had begun competing directly with Cargill for American soybeans. App. at 314-15, 783. Ferruzzi was a large holder of May 1989 long soybean contracts, holding in mid-May more than 80% of the May long contracts still open (the "open interest") through expiration of the May contract on May 19, 1989. App. at 347-48.

In 1988, the CFTC became interested in Ferruzzi because it had not submitted the reports required to allow it to hold futures positions in excess of the CFTC-set limits and because it had not answered all of the CFTC's questions. App. at 619-23, 733, 1011-12, 1012-14. The CFTC became concerned with Ferruzzi's pattern of maintaining large long soybean futures positions late in the delivery month and taking delivery of large quantities of soybeans under the futures contracts. App. at 623. Both the CFTC and CBOT monitored Ferruzzi's futures and cash positions in late 1988 and into the spring of 1989. *Id.*; App. at 694-96, 736-41. The CFTC and CBOT also gathered information from other market participants and received complaints that mirrored their own concerns. App. at 234-37, 702-05, 866-69, 1027-30, 1033, 1035, 1151-52.

Between May 12 and May 19, Cargill sent four letters to the BCC complaining that it was losing money, that the "futures price appears . . . to be artificial" and that it was "amazed that the regulatory authorities have permitted a single firm to amass such control of the soybean [sic] visible as well as a dominant position in the expiring futures contract . . . ."[5] App. at 864-65, 866-67, 870, 873. On May 18,

---

[5] The plaintiffs introduced evidence that, when testifying under oath on July 13, 1989 in an injunction action brought by Ferruzzi, Chairman Mahlmann denied that he had received complaints from any of the commercials about Ferruzzi's position as the dominant long prior to July 11. App. at 218-19, 903. In fact, Mahlmann had received a number of letters which did not

(continued...)

1989, Cargill Director James Howard sent an internal memorandum to his subordinates, informing them of Cargill's dual objectives as follows:

>   1.   Establish for once and all the economic parameters of futures market pricing as it relates to the underlying cash market.

>   2.   A distant second is to recover the losses we have experienced because of uneconomic disruption caused by the actions of the principal long in the market. *Punishing* that long has value only in the reinforcement of the first objective that might occur.

App. at 872 (emphasis in original). The memo also indicates that:

>   If it appears, once the dust settles, that it's back to business as usual, consider selling our membership in the CBOT and withdrawing our elevators from deliverable status. This *is* a viable option, because failure to act on the part of those responsible for regulating these markets would simply confirm the reality of recent years in which the delivery process has not been allowed to work its economic role of reflecting the cost of carrying grain in the underlying marketplace.

*Id.* Throughout the spring of 1989, the CFTC and CBOT staffs separately communicated frequently with Ferruzzi to explore Ferruzzi's reasons for simultaneously holding a substantial long futures position and a large supply of deliverable soybean warehouse receipts. App. at 625, 629, 699, 1015-16; Tr. at 1600-03. The CFTC and CBOT repeatedly urged Ferruzzi to liquidate its futures positions and to buy

---

(...continued)
explicitly mention Ferruzzi but contained numerous indirect references. App. at 234-37, 864-70.

the soybeans it claimed it needed at lower prices in cash markets. App. at 634, 706-10, 1040-41. The CFTC and CBOT exchanged information gathered from Ferruzzi during these conversations. App. at 706-09, 1031.

As the May 19 expiration of trading in the May soybean futures contract approached, Ferruzzi held a large position in both May futures and the deliverable supply of physical soybeans and was not significantly reducing its position. App. at 736-37; Tr. at 1610-14, 1663-65. Thus, on May 18, the day before the May contract expired, the CFTC sent a private letter to Ferruzzi directing it to liquidate its soybean futures position down to three million bushels or less by the end of trading on May 19. Ferruzzi complied but in fact it moved its large May long position to the July futures contract. App. at 634, 676-77, 743. Hence, the CFTC and CBOT intensified their monitoring of the July soybean futures contract after the May contract expired. App. at 636-38, 743. At its June 5 meeting, the BCC called several market participants, including Ferruzzi, to discuss the CBOT's concerns. App. at 744-46, 1042-49. The CFTC staff also contacted Ferruzzi on at least seven occasions throughout June (June 1, 6, 12, 13, 14, 19, and 28), urging Ferruzzi to liquidate its July futures position and to buy soybeans more cheaply in the cash market. App. at 398-402, 405, 639-40, 710-11, 1093-95. The CFTC's concern over Ferruzzi's situation remained very high at June's end. App. at 641.

At one point in May 1989, Cargill still had a large short futures position, including approximately 30 million bushels short in the July 1989 soybean contract alone. App. at 362-63. During May and throughout June, Cargill began incurring losses in its July soybean position, in amounts ultimately exceeding $20 million. *Id.*; App. at 527-29. A Cargill senior manager, Dan Huber, met with Chairman Mahlmann in the Chairman's office of the CBOT on the

morning of June 23, 1989. App. at 207. This was not out of the ordinary; Mahlmann testified that he "met with the members of the exchange or member firm representatives on a frequent basis." *Id.* Also present in the meeting were CBOT President Donovan and, at times, Hal Hansen, another Cargill senior manager. According to Mahlmann, they discussed the discrepancy between futures and cash in the previous May contract, the exacerbated discrepancy in July and the need to take action with regard to the general performance of grain contracts. App. at 213.

On June 26, 1989, Dan Huber of Cargill sent a letter to Chairman Mahlmann, following up on the meeting, which stated that "we" must move forward with a "basic action plan." App. at 879. The letter emphasized that "[f]oremost in our plan is an understanding by the staff and committee members of the problems/concerns some of us have expressed . . . ." *Id.* Mahlmann testified that the "basic action plan" was not addressing an emergency resolution but "contracts in general" and that the group agreed to form a committee of long and short commercial users. App. at 214. Huber also distributed an internal memorandum at Cargill summarizing the meeting at CBOT and concluding that he was confident that Cargill's concerns were finally going to get attention. App. at 874-78.

On June 27, BCC Chairman Weisenborn wrote to Ferruzzi expressing concerns, warning of possible actions by CBOT and urging Ferruzzi to liquidate. App. at 946. In a letter to CBOT's BCC dated June 28, 1989, TENCO Limited Partnership (a non-commercial CBOT member) complained that Ferruzzi's actions might cause "(A) the destruction of the integrity of the contract as deliveries would have no effect on the price determining function[;] (B) the demoralization of the soybean contract . . . [;] (C) price manipulation (by means of a corner) . . . [and;] (D) the undermining of the entire futures contract marketplace . . . ." App. at 1151. Tom Neal of TENCO met with the BCC to discuss the

letter. App. at 608. Continental Grain Company also sent a letter to the BCC. App. at 236-37. Further, Glenn Hollander and Dave Brennan, members of CBOT's soybean committee, also raised concerns to the BCC "that there must be something wrong." App. at 609.

Chairman Mahlmann called Cargill on June 29, 1989, to follow up on their meeting. App. at 214, 280. By the time of this telephone conversation, Cargill had eliminated its July 1989 soybean futures position. On the day after this conversation, however, Cargill began re-acquiring a short position in the July 1989 soybeans futures contract. App. at 364-65.

During late June or early July of 1989, BCC Chair Weisenborn made some handwritten notes summarizing the situation confronting the Board in early July 1989. App. at 571-72, 883-87. These notes began with a list of "recent problems," including a "drought," an "old crop" and a "short supply." App. at 883, 885. The notes stated: "(3) Basic problem is rich nonmember long in narrow supply market" and "(4) Shorts expect to be rescued." App. at 885. The next page of the notes described the "recent problems" as including: "Member Commercial Using hedger exemption (BOT—CFTC)" and "Non member speculator—On the long side in a market (a guy with $) tight enough for he (and maybe others) to cause a problem." App. at 886. The plaintiffs argue that these notes are a clear reference to Cargill and Ferruzzi. Pet. Br. at 15. The notes also indicated that "we have ultimate weapon—emergency action—nuclear bomb." App. at 883. Further, they stated that there is "pressure on BCC to get the other guy" and that the "Winners go to [the] Bank" and the "Losers [go] to [the] newspaper." App. at 883-84. The notes concluded by stating: "shorts are in greatest danger and expect to get rescued. Politically they are harder to deal with." App. at 884.

*4.   Actions by CFTC and CBOT*

Ferruzzi's July futures position was particularly large in relation to the soybeans in a deliverable position that Ferruzzi did not already own, and the position was being reduced only modestly. App. at 641. The CFTC experts believed that Ferruzzi was not bidding for soybeans at its processing plants at prices comparable to prices demanded in taking delivery of soybeans on July futures and shipping them to its plants. App. at 642.

On July 5, the BCC met to gather market information from Ferruzzi and others and to consider what action to take in light of Ferruzzi's market position and failure to cooperate. App. at 755-70, 1155-56. Before this BCC meeting, CBOT Market Surveillance informed the BCC that: registered warehouse receipts were dramatically lower than in the prior years (App. at 964), Ferruzzi owned approximately 85% of those warehouse receipts (*Id.*), Ferruzzi had been slow to liquidate and held an increasingly large percentage of all open July futures (App. at 967), and the July contract was not converging with cash values and was at an unusual level relative to subsequent contract months (App. at 964).

The BCC's discussions with Ferruzzi lasted more than two hours. App. at 595. The BCC had noted that Ferruzzi could buy cash beans more cheaply near its domestic processing plants than by standing for delivery on July futures and so it strongly urged Ferruzzi to buy cash beans and to promptly liquidate its July hedges. App. at 769-71. CBOT staff and BCC members also questioned Ferruzzi's candor, since Ferruzzi now claimed that its hedges, which it had previously said were for export, were for domestic processing. App. at 768-69.

On July 6, Ferruzzi met with CFTC staff. App. at 712; Tr. at 1630-35. At that meeting, Ferruzzi representatives admitted that it had not been bidding delivery equivalent values for soybeans in cash markets. App. at 1160-61. The

CFTC instructed Ferruzzi to bid aggressively for cash soybeans, to promptly raise cash bids to delivery equivalent values and to begin immediate, substantial liquidations of its July soybean futures. App. at 1157-61.

As of July 7, 1989, Ferruzzi had not begun to liquidate. App. at 771-72. Thus, in a letter drafted that day, the BCC expressed its dismay and reiterated that Ferruzzi should reduce positions immediately. App. at 772-73, 976-77. The same day, the CFTC's Director of Market Surveillance recommended to the CFTC Commissioners that they revoke Ferruzzi's July hedge exemption. App. at 651-52. The Commissioners authorized CFTC staff to do so. App. at 650. The plaintiffs note that on that day, a Cargill representative called CBOT President Donovan and spoke with him for almost 18 minutes. App. at 552.

On July 10, 1989, Ferruzzi continued to ignore liquidation requests and, instead of liquidating, Ferruzzi responded by letter to the BCC. App. at 774, 978-80. The CBOT's BCC Chairman and the CFTC's Director of Market Surveillance read the letter as an admission that Ferruzzi had not been bidding delivery values in domestic cash markets; an indication that Ferruzzi might stand for delivery despite the CFTC's and CBOT's urging that it liquidate; and as a threat to sue CBOT if forced to liquidate. App. at 567-68, 598-99, 647-49. After the close of trading, the BCC met and concluded that Ferruzzi's concentrated futures and deliverable supply positions threatened an orderly liquidation of the July soybean futures contract. App. at 600-02, 604-07, 1241-44. The BCC recommended that the CBOT Board of Directors take emergency action to address the threat. App. at 601-05, 776, 981-82, 1241-44. This same day the CFTC verbally notified the CBOT that it was going to revoke Ferruzzi's anticipatory hedge position effective three days prior to the expiration of the July 1989 contract, which was July 18. App. at 653. But when the Chairman of the BCC recommended to the Board that it take action, he was not

aware that the CFTC was also acting on the matter. App. at 605. The BCC Chairman conveyed to CBOT Chairman Mahlmann orally and by letter the recommendation that the CBOT take action. App. at 600-02, 981-84.

After hearing from the BCC, Mahlmann telephoned the CFTC Chair, Wendy Gramm, to inform her of the situation. Chairman Gramm said that her staff would look into emergency alternatives for the CBOT to consider. App. at 241-42. Chairman Mahlmann met that afternoon in his office with the CBOT's president, the CBOT's counsel and the CBOT's vice president in charge of Investigations and Audits. App. at 246-47. At that meeting, they discussed the possibility of a resolution but made no decision at that time as to what type of emergency resolution to pursue.

On the morning of July 11, 1989, Chairman Mahlmann again spoke with the CFTC Chair, who told him that her staff had looked into potential alternatives for the CBOT to consider and that she would fax these alternatives to Mahlmann shortly. App. at 248. Within minutes, the CFTC faxed the CBOT a copy of its private letter to Ferruzzi notifying Ferruzzi that: (1) the CFTC was approving an increase in Ferruzzi's annual anticipatory hedge position for the new crop; and (2) it was revoking Ferruzzi's anticipatory hedge position during the last three trading days for the July and August soybean contracts. App. at 1006-07. In the same fax, the CFTC also included a list of five alternatives which the CBOT might follow to avoid the threat to orderly liquidation. App. at 248-49, 651-54, 1005.

The CFTC Market Surveillance Director and the CBOT Chairman both testified that the CFTC's revocation of Ferruzzi's hedge exemption did not fully remove the threat to the July contract. App. at 288-89, 658-59. The revocation did not specify when Ferruzzi had to start liquidating its position, nor did it prevent other market participants from increasing their positions to a level that could threaten

orderly liquidation. App. at 658-59. Further, the CFTC's letter revoked only Ferruzzi's anticipatory hedge exemption and did not prevent Ferruzzi from claiming that its hedges were for other purposes, like exports. *Id.*

The morning of July 11, Chairman Mahlmann and President Donovan met again to discuss emergency action. App. at 286-87, 548-51. In these meetings, the Chairman drafted what would become the Resolution, and he then recommended it to the CBOT's Board of Directors that afternoon. *Id.* Before the Board of Directors meeting, Mahlmann again called the CFTC Chairman to inform her of the proposed Resolution. App. at 257-58. Mahlmann described the Resolution and noted that it combined alternatives one and two from the fax the CFTC had sent over that morning. *Id.* The CFTC Chairman stated that the proposal sounded "reasonable" and that it had the advantage of providing an advance indication whether Ferruzzi intended to cooperate with the two regulatory authorities. App. at 258-59, 1162.

Later that morning, Mahlmann polled the board to determine whether any director personally owned or controlled July soybean futures. App. at 260-61; 1008-10. One director responded affirmatively and recused himself. App. at 1008. According to a handwritten list, however, six directors, including Chairman Mahlmann and Vice Chairman Arbor, were affiliated with clearing firms that had customer or proprietary (*i.e.*, house) positions which were net short.[6] App. at 881-82. The plaintiffs argue that this "conflict" list was compiled in a manner consistent with

---

[6] At the time, Mahlmann was the Chairman of a company known as Stotler and owned 13% of the company. The conflict list indicated that Stotler had a net customer short position of over two million bushels. App. at 189, 881. Stotler was experiencing financial difficulties at the time and would declare bankruptcy within a year. App. at 188.

the Board's conflict standards as reflected in CBOT Reg. 540.05(c) ("No member of the Board shall hear an appeal if . . . he or any person or firm with which he is affiliated has a financial, personal, or other direct interest in the matter."). App. at 888. The plaintiffs argue that this information was enough to deprive the Board of a quorum. However, the CBOT staff determined upon request that there were enough non-conflicted members to make a quorum, and these members continued to consider the Resolution. App. at 194-95.

Mahlmann distributed a packet of material to the remaining directors, which included the July 7 BCC letter to Ferruzzi, the July 10 Ferruzzi letter to the BCC, the July 11 CFTC letter revoking Ferruzzi's hedge exemption and information regarding Ferruzzi's cash soybean transactions. App. at 262-63, 985-1002. Mahlmann summarized the relevant information for the Board, and then the Board debated the market situation and considered a variety of potential emergency actions. App. at 264-66. After a thorough discussion, CBOT's directors voted 16 to 1 to approve the proposed Resolution. App. at 266. Among the directors voting to approve were two public directors: an Oregon wheat farmer and the Dean of the Graduate School of Business of the University of Chicago. App. at 268-69. No director who participated in the meeting personally owned or controlled July soybeans futures contracts. App. at 261-62.

According to the plaintiffs' expert, Dr. Jeffrey Williams, a professor in the Department of Agriculture & Resource Economics at the University of California—Davis, based upon known available soybeans for delivery, there was no possibility of Ferruzzi's implementing a corner or otherwise causing a market manipulation in the July 1989 soybean contract. App. at 339-44, 515-16. Critical to his opinion was his conclusion that the CFTC's order of July 11, requiring Ferruzzi to liquidate its July futures position down to three

million bushels, effectively prevented a corner without further CBOT action. App. at 515-16. When asked whether liquidation of the July contract, assuming that Ferruzzi complied with the July 11 order, would have been orderly, the plaintiffs' expert said, "I think so. It was in Ferruzzi's interest to minimize price impacts that would have been costing it money." App. at 516.

The plaintiffs' expert also opined that it would have been impossible for Ferruzzi to exercise a squeeze or a corner because it lacked control over the deliverable supply of soybeans and did not have the element of secrecy required to execute such a market manipulation. App. at 518-23. The plaintiffs' expert further testified that there was no artificiality in the pricing of the July 1989 soybean futures contract as of the time of adoption of the Resolution. App. at 335-43. Prior to the Resolution, the price of the futures contract resulted from normal market forces, was convergent with the July cash prices and was consistent with historical pricing trends and data. *Id.*

On October 10, 2002, the trial court granted the defendants' Rule 50(a) motion from the bench, holding that there was no legally sufficient evidentiary basis for a reasonable jury to return a verdict that the defendants' dominant motive was held in bad faith. App. at 793-815. This appeal followed. The plaintiffs (appellants) argue that the district court improperly granted judgment as a matter of law because there was enough evidence to go to the jury on the question of bad faith. The defendants (appellees), of course, disagree. Moreover, the defendants contend that (a) the plaintiffs failed to present evidence that the Resolution restrained trade in any relevant market for cash soybeans; (b) any restraint in the soybeans futures market was

reasonable; (c) the plaintiffs lacked standing[7]; (d) the class was not properly certified; and (e) the district court erred in allowing the plaintiffs' expert to testify. Because we affirm the district court's grant of judgment as a matter of law on the basis of a lack of evidence of bad faith, we do not reach these other issues.

## II.  DISCUSSION

### 1.  *Motion To Strike Portions of the Appellees' Brief and Record on Appeal*

As a preliminary matter, the appellants have moved to strike sixteen exhibits from the appellees' brief and from the record on appeal, arguing that Defense Exhibit (DX) 1 was ruled inadmissible by the district court, and the other exhibits were never "formally" moved into evidence. Given that no particular magic words are required to admit an exhibit into evidence, it would be impossible for us to determine which of these exhibits the district court intended to treat as formally admitted. *See Hastings v. Reynolds Metals Co.*, 165 F.2d 484, 486 (7th Cir. 1947) ("It is not indispensable that an exhibit be offered and admitted in evidence by any precise words."). Perhaps this is why a motion to strike matter from the record on the ground that it is not properly a part of it must first be presented to the district court. *See* Circuit Rule 10(b); *see also* Fed. R. App. P. 10(e); *Practitioner's Handbook for Appeals to the United States Court of Appeals for the Seventh Circuit* at 95 (2002) ("[I]f there is a dispute as to what is part of the record, the parties should resolve that in the district court."). The appellants have brought their motion in the wrong court.

---

[7] In addition to our opinion in *Sanner*, the issue of antitrust standing with respect to the present action is discussed in *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 498 (7th Cir. 2002) (Cudahy, J., concurring).

Whether or not these exhibits were technically admitted into evidence, however, is not important to this court's analysis, since the relevant content of each exhibit was read into the record and discussed extensively at trial.[8] Therefore, to avoid any confusion, our analysis relies on the record testimony regarding each exhibit in question and not upon the exhibit itself. The appellant's motion to strike is denied.

### 2.  *Judgment as a Matter of Law*

We review *de novo* the district court's decision to grant judgment as a matter of law. *See Mathur v. Board of Trustees of Southern Ill. Univ.*, 207 F.3d 938, 941 (7th Cir. 2000); *Lane v. Hardee's Food Sys., Inc.*, 184 F.3d 705, 707 (7th Cir. 1999). Judgment as a matter of law is proper only where there is no legally sufficient basis for a reasonable jury to find for the nonmoving party. *See* Fed. R. Civ. P. 50(a). In considering a Rule 50(a) motion, the court is required to view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in that party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000); *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043-44 (7th Cir. 1999). We may not weigh the evidence or pass on the credibility of witnesses, nor may we substitute our view of the contested evidence for the jury's. *See Reeves*, 530 U.S. at 150*; Place v. Abbott Labs.*, 215 F.3d 803, 809 (7th Cir. 2000). However, in order to reverse a district court's grant of judgment for the defendants as a matter of law, there must be more than a

---

[8]  *See, e.g.*, Tr. at 1342-43 (DX3); Tr. at 1343-44, 1614-15 (DX4); Tr. at 350 (formally moving DX12 into evidence); Tr. at 1720-21 (DX38); App. at 702-705 (DX40); Tr. at 1721-22 (DX43); Tr. at 1600-03 (DX44); Tr. at 1663-65 (DX55); Tr. at 1610-14, 1742-1744 (DX70); Tr. at 1755-63 (DX85); Tr. at 325-27 (DX107); Tr. at 1630-35 (DX123).

mere scintilla of evidence to support the plaintiffs' case. *See Mutual Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 612 (7th Cir. 2001); *3M v. Pribyl*, 259 F.3d 589, 605 (7th Cir. 2001).

It is undisputed that the CBOT had the power to adopt the Resolution in order to address market "emergencies." *See, e.g., Cargill, Inc. v. Board of Trade*, 164 F.2d 815, 823 (7th Cir. 1947) ("Almost every act of an agency such as the Board and Clearing affects or restrains commerce in some respect, but such restraints as may be within the rule of reason are not unlawful."). In 1989, § 5 of the CEA assigned the CBOT the duty to "provide[ ] for the prevention of manipulation of prices and the cornering of any commodity" traded on the CBOT. 7 U.S.C. § 7(d) (1989). The CBOT was authorized by law to deal with any market "emergency," which was defined by the CFTC as:

> Any . . . occurrence or circumstance which, in the opinion of the governing board of the contract market, requires immediate action and threatens or may threaten such things as the fair and orderly trading in, or the liquidation of or delivery pursuant to, any contract for the future delivery of a commodity or any commodity option on such contract market.

17 C.F.R. § 1.41(a)(4)(ii) (1989). By way of describing an actual or attempted manipulation, "emergencies" were defined to include "any actual, attempted, or threatened corner, squeeze, congestion, or undue concentration of positions . . . ." *Id.* § 1.41(a)(4)(ii)(B). The plaintiffs, however, argue that the Resolution was an improper response by the CBOT because it was not taken for any of these proper regulatory purposes but instead was adopted in bad faith. *See Cargill*, 164 F.2d at 823 ("Only the bad faith of the defendants in the discharge of their duties under the emergency in which they purported to act can vitiate the defendants' action.").

In order to understand the context of the district court's decision here, we note that the CBOT is a self-regulated entity. Its board is made up of members who are not only knowledgeable in the market operations that the CBOT is charged with regulating, but who may have a personal interest in the market. "The concept of exchange self-regulation necessarily implies that the boards of exchanges shall contain a substantial number of persons with first-hand knowledge of the market and that these persons shall be free to share in important deliberations." *Sam Wong & Son, Inc. v. New York Mercantile Exch.*, 735 F.2d 653, 672 (2d Cir. 1984). The members of exchange boards may to a degree have potentially mixed motives in taking action. These motives, of course, include genuine regulatory concerns, but the impact of the regulatory actions may advance private interests and harm the interests of competitors. *Id.* at 677 ("[I]f the governors sincerely and rationally believe their action is in the public interest, there should not be liability simply because the action has the incidental effect of advancing their private interests or damaging someone whom they do not like."). In order to constitute bad faith, the plaintiffs must show that "self-interest or other ulterior motive unrelated to proper regulatory concerns is alleged to constitute *the sole or the dominant reason* for the exchange action." *Id.* (emphasis added). In other words, it is not enough for the plaintiffs to show that the CBOT, or some subset of its membership, was incidentally motivated in part by a desire to "rescue the shorts," to "punish the long" or to advance their own interests—the plaintiffs must present evidence that the CBOT's sole or dominant motive for acting was to serve personal interests.

We believe that the plaintiffs have presented no evidence from which a jury could reasonably find that the CBOT's *dominant* motive was held in bad faith, and that there is scant evidence of any improper motive. The plaintiffs have argued that there were two possible bad faith and improper motives that may have been important to the CBOT. First,

CBOT may have acted to "rescue the shorts," to "punish the long" and specifically to benefit Cargill, one of the politically powerful members of the CBOT. Second, the CBOT may have adopted the Resolution to benefit its board members who were affiliated with brokerage companies that had house or customer accounts that were net short. Before addressing these two alleged bad faith motives, we will discuss the substantial evidence in the record of a good faith regulatory motive.

### A.  Good faith motive

There is no need to repeat our discussion of the factual history here. The record shows that starting in 1988, both the CFTC and the CBOT had been concerned with Ferruzzi's pattern of maintaining large long soybean futures positions late in the delivery month and of taking delivery of large quantities of soybeans under the futures contracts. Decision makers from both the CFTC and the CBOT testified that they were concerned that Ferruzzi's actions threatened the creation of a corner and were a threat to the orderly liquidation of the market. The plaintiffs do not deny that the threat of a corner or of an obstacle to orderly liquidation would represent a legitimate occasion for regulatory concern, and that a response to this concern would not constitute an act of bad faith.

The CFTC and CBOT repeatedly communicated their concerns to Ferruzzi, through letters and in personal meetings. Various market participants, including TENCO Limited Partnership and Continental Grain Company, expressed these same concerns to the CBOT and to the CFTC. On several occasions, the CFTC gave specific directives to Ferruzzi, such as an order to liquidate its May soybeans futures position and, later, to liquidate its July soybeans contracts. With respect to this latter directive, Ferruzzi's

response suggested that it might ignore the CBOT's and the CFTC's requests and might instead sue the CBOT.

Ultimately, the CFTC had serious concerns that Ferruzzi's heavy futures and deliverable supply positions threatened orderly liquidation of the July futures contract. Hence, the CFTC revoked Ferruzzi's July anticipatory hedge exemption. Even the plaintiffs' expert, Dr. Williams, agreed that Ferruzzi represented a threat to orderly liquidation, at least before the CFTC revoked its anticipatory hedge exemption. App. at 397.

A director of the CFTC testified that after the Ferruzzi hedge exemption was revoked, there was still a threat to the markets because the CFTC had not specified *when* Ferruzzi had to start liquidating its position.[9] Additionally, the revocation of the anticipatory hedge exemption did not prevent other market participants from increasing their positions to a level that could threaten orderly liquidation. Finally, the CFTC revoked only Ferruzzi's anticipatory hedge exemption and did not prevent Ferruzzi from claiming that its hedges were for the purpose of other operations, like exports. Ferruzzi's July 10 letter suggested that Ferruzzi might play hardball, and that it might not intend to cooperate.

The Chairman of the CFTC, upon request of the CBOT, provided the CBOT with a list of five additional emergency measures to consider taking. None of these five alternatives suggested that the CBOT do nothing. The CBOT based the Resolution on a combination of the first two of the CFTC's five suggestions. After the Chairman of the CBOT discussed the Resolution with the CFTC Chairman, she agreed that it sounded reasonable and spoke positively about its advantages. Although in *American Agriculture Movement*, we held that the CFTC did not formally "approve" the

---

[9] It is important to note that there is no allegation that the CFTC had any improper purpose or was in any way biased.

Resolution so as to give the CBOT antitrust immunity, the close involvement and informal approval of the CFTC in all matters involving Ferruzzi, and particularly in the adoption of the Resolution, make it particularly difficult to find that the CBOT acted in bad faith and is a significant factor in our decision today. *See Lagorio v. Board of Trade*, 529 F.2d 1290, 1292 (7th Cir. 1976) (CFTC's "concurrence" gives "[a]dded weight" to the conclusion that the exchange board's emergency action was within its discretion). Moreover, the Board passed the Resolution by a 16-1 margin. Ten of those voting directors are not alleged to have any conflict of interest. Based on all of this evidence, we find that the record strongly suggests that the CBOT was motivated by a legitimate regulatory concern. With that in mind, we discuss the evidence which the plaintiffs have presented to show that the CBOT's dominant purpose was in fact in bad faith.

### B.  *Rescuing the shorts and punishing the long*

The plaintiffs attempt to establish that the CBOT's dominant motives were "improper." First, the plaintiffs present evidence of communications between Cargill and the CBOT which they argue suggest an improper motive. Second, the plaintiffs present expert testimony that at the time the CBOT acted, there was no legitimate regulatory purpose for such an action.

The plaintiffs rely heavily on an internal memorandum dated May 18, 1989, by Cargill Director James Howard, which indicates Cargill's desire to "punish the long," i.e., Ferruzzi. *See* App. at 872. First, we note that the plaintiffs do not argue that this internal memorandum was ever seen by the defendants. The plaintiffs refer to it largely to show that Cargill had a selfish motive, and they argue that there is an inference that CBOT adopted this motive. We believe, however, that even if the memorandum undisputably

indicated that Cargill's dominant motive was to feather its own nest, it would be improper to infer from this fact alone that CBOT's motive was improper and held in bad faith. As every judge well knows, one can listen to a proponent's self-interested argument for following a particular course and ultimately follow that course for noble reasons of one's own without buying into the motives of the proponent.

And, even so, the only fair reading of the internal memorandum is that Cargill's main concern was simply that the "delivery process has not been allowed to work its economic role of reflecting the cost of carrying grain in the underlying marketplace." This seems to be the case because the memorandum specifically states that "[p]unishing that long has value only in the reinforcement of the first objective. . . ." *Id.* The first objective is to "[e]stablish . . . the economic parameters of futures market pricing as it relates to the underlying cash market." *Id.* Therefore, this memorandum does not really reflect a predatory motive on the part of Cargill. It certainly does not suggest that Cargill's dominant motive was predatory, and it does not properly support an inference that the CBOT was stained with a bad faith motive.

The four letters Cargill sent to the BCC reflected the same legitimate concern for regulatory action about which others, including the CFTC, had inquired. App. at 864, 866, 870, 873. In these letters, Cargill complained that it was losing money, that the "futures price appears . . . to be artificial" and that it was "amazed that the regulatory authorities have permitted a single firm to amass such control of the soybean [sic] visible as well as a dominant position in the expiring futures contract. . . ." App. at 866-67, 870. Cargill expressed these same concerns in its five-page internal "action plan." App. at 874-78. Just because Cargill might have stood to profit from the regulatory action that it was urging does not render its concern illegitimate, and nothing here suggests bad faith on the part of the CBOT.

The plaintiffs also make much of the so-called Weisenborn notes. App. at 883-87. These notes, however, do not suggest that either Cargill or the CBOT was acting illegitimately. The notes state, *inter alia*, that there is "pressure on BCC to get the other guy" and that "shorts are in greatest danger and expect to get rescued. Politically they are harder to deal with." App. at 883-84. As the district court noted, however, there is nothing wrong with rescuing the shorts if they need to be rescued from an alleged squeeze or other improper market manipulation. Weisenborn confirmed that this was what he meant by his notes when he testified that the shorts were "expecting us to protect them by creating an orderly liquidation . . . ." Tr. at 1189. While the memorandum is admittedly colorful, it does not suggest that the CBOT should take emergency action *because* the shorts are harder to deal with politically. In fact, there is really nothing in these notes to suggest that the CBOT was considering intervening for a reason other than to prevent further market manipulation. These same notes specifically state: "BCC, we have to prevent manipulation of prices and cornering of any commodity." Tr. at 1179. Although superficially suggestive, these notes do not establish the CBOT's bad faith.

The plaintiffs have presented extensive evidence that Cargill communicated regularly with the CBOT during the relevant time period. However, officials of the CBOT "met with the members of the exchange or member firm representatives on a frequent basis." App. at 207. Since the CBOT is a self-regulated entity, market participants are expected and encouraged to alert the exchange if they perceive manipulation or other problems involving its contracts. App. at 704-05; Tr. at 695-96; *cf. Apex Oil Co. v. DiMauro*, 822 F.2d 246, 260 (2d Cir. 1987) (finding that communications between exchange and "long" defendants in the face of an impending default did not support an

inference of conspiracy involving the exchange). Other commercials and non-commercials communicated with the CBOT about the same problem. App. at 236-37, 608, 1151-52. The mere fact that the CBOT met and communicated with Cargill on a regular basis does not suggest that its motive in adopting the Resolution was primarily to benefit Cargill or was otherwise held in bad faith.[10]

The plaintiffs argue that the CBOT's reason for adopting the Resolution was not regulatory concern but instead Cargill's indirect threat to stop using the CBOT's futures

---

[10] The plaintiffs also argue that under *Rajewski*, a jury could have considered the fact that Chairman Mahlmann lied under oath in another proceeding when he denied having received complaints from any of the commercials about Ferruzzi. *See United States v. Rajewski*, 526 F.2d 149, 158 (7th Cir. 1975) ("It is well settled that untrue exculpatory statements may be considered as circumstantial evidence of the defendant's consciousness of guilt."). *Rajewski* and its predecessors, however, were all criminal cases in which one element that the government had to prove was whether the defendant committed a crime knowingly. *See Rajewski*, 526 F.2d 149 (knowingly and willfully making and using false documents); *United States v. Riso*, 405 F.2d 134 (7th Cir. 1968) (receiving and concealing property transported interstate, knowing it to have been stolen); *United States v. Scoleri*, 374 F.2d 859 (7th Cir. 1967) (same). This court allowed consideration of untrue exculpatory statements because they suggested that defendants knew that they were committing crimes. In the present civil case, it may not be so simply and fairly inferred from the alleged untrue exculpatory statements that Chairman Mahlmann's dominant motive was held in bad faith. We therefore decline to extend this doctrine to apply to the case at bar. Moreover, in the present case, Mahlmann has presented an explanation for the seeming inconsistencies and has never been adjudicated to have testified falsely. Finally, *Rajewski*'s holding does not imply that one Board member's untrue exculpatory statement can be considered as evidence of the motive of the entire Board. Therefore, the district court did not err in giving little, if any, weight to this piece of evidence.

market. Pet. Br. at 40. In one of Cargill's letters to the CBOT, it did state that "we are seriously reconsidering our operating philosophy because of the difficulty we face in using futures as a hedge against inventories." App. at 867. The plaintiffs have presented no direct evidence, however, that anyone at the CBOT was actually concerned about or motivated by this threat.

Even if the CBOT had been motivated by Cargill's threat to pull out of the market, this would not constitute "bad faith" if the CBOT believed that Cargill would be withdrawing for a legitimate reason, *i.e.*, the CBOT's failure to respond effectively to attempts at market manipulation. It is not bad faith to respond to legitimate complaints in order to maintain investor confidence in the exchange. *See Apex Oil Co. v. Dimauro*, 641 F. Supp. 1246, 1279-80 (S.D.N.Y. 1986), *aff'd in part and rev'd in part*, 822 F.2d 246, 261 (2d Cir. 1987) (finding an exchange's decision to keep the market open in order to avoid a loss of investor confidence did not constitute an improper or ulterior motive); *Grossman v. Citrus Assoc. of N.Y. Cotton Exch., Inc.*, 742 F. Supp. 843, 853 n.10 (S.D.N.Y. 1990) (finding that an exchange's decision to keep the market open in order to increase the number of exchange members and increase the trading volume was akin to avoiding a loss of investor confidence and did not constitute an improper ulterior motive). The evidence in the record suggests that Cargill's reasons for considering withdrawal stem from this legitimate concern. *See, e.g.*, App. at 872.

Finally, the plaintiffs presented evidence that the CBOT's alleged "good faith" motive could not have been the CBOT's true motive, because according to the plaintiffs' expert, there was no legitimate threat to orderly liquidation after the CFTC revoked Ferruzzi's anticipatory hedge position. However, what matters is not whether there was in fact a legitimate threat, but whether the CBOT believed in good

faith that there was such a threat. *See Sam Wong & Son*, 735 F.2d at 677 (board must "sincerely and rationally believe their action is in the public interest").[11]

All the evidence at trial demonstrated that the CFTC, an entity not alleged to have had an improper motive, thought that there remained a legitimate threat. If the CFTC believed that the threat continued and that further action was warranted, it was reasonable for the CBOT to hold this belief as well. Indeed, the evidence at trial demonstrated that the CBOT and the CFTC shared the same concerns.

The CFTC Market Surveillance Director testified at trial that he believed there was still a legitimate threat to orderly liquidation, even after the CFTC's revocation of the anticipatory hedge exemption, and he gave reasons supporting his belief. App. at 288-89, 658-59. Moreover, after the CFTC revoked Ferruzzi's anticipatory hedge position, the Chairman of the CFTC faxed the CBOT a list of emergency alternatives that the CBOT might consider taking. App. at 248-51, 652-54, 1004-05. This fax would have been not only unnecessary but reckless on the part of the CFTC if it believed there was no longer a threat to orderly liquidation.[12] The Chairman of the CBOT discussed the

---

[11] Under *Sam Wong*, a party can demonstrate bad faith on the part of an exchange simply by showing that an emergency action lacked any "basis in reason." *See Sam Wong & Son*, 735 F.2d at 678 n.32. In this case, however, there is insufficient evidence in the record to support a finding that the CBOT's actions constituted "the kind of reckless and virtually irrational exchange action that might independently support an inference of bad faith." *Minpeco, S.A. v. Hunt*, 693 F. Supp. 58, 63 (S.D.N.Y. 1988) (citation omitted).

[12] The plaintiffs assert that this fax was not a list of alternative actions for the CBOT. They base this assertion on the fact that the fax contained one or more alternatives which they argue the CBOT lacked the power to adopt. We do not find this argument persuasive given that the CFTC director who drafted and sent the

(continued...)

proposed Resolution with the Chairman of the CFTC before adopting it, and Chairman Gramm thought that it was "reasonable." App. at 258-59, 1162. While viewing the market from a distance and with the benefit of hindsight, it might appear that there was in fact a minimal threat to orderly liquidation, the evidence in the record clearly shows that this was not the belief of the CBOT or the CFTC at the time.

Thus, we have found no evidence in the record actually suggesting that the CBOT was motivated by an improper desire simply to rescue the shorts and help Cargill. At best, the plaintiffs have presented a scintilla of evidence that one of the CBOT's motives may have been held in bad faith. This is not enough evidence to go to the jury. *See Mutual Serv. Cas. Ins.*, 265 F.3d at 612; *3M*, 259 F.3d at 605. Even if we assume that there was sufficient evidence for the jury to find that one of the CBOT's motives was improper, this alone would not be enough for the plaintiffs to recover. As discussed *supra*, there must be evidence in the record that the CBOT's bad faith motive was its *dominant* motive. *See Sam Wong & Son*, 735 F.2d 653, 677. The plaintiffs have presented no evidence suggesting that the CBOT's alleged bad faith motive could have been more powerful than CBOT's legitimate regulatory purpose. To the contrary, all the evidence in the record suggests that the CBOT's dominant motive was its legitimate regulatory purpose.

---

(...continued)

fax testified that it was indeed a list of alternative actions for the CBOT to consider, prepared at the request of the Chairman of the CFTC. Tr. at 1424. Further, he suggested that, in his view, the CBOT could have taken the alternatives listed in the fax. *Id.* The plaintiffs do not argue that the CFTC was a part of the alleged conspiracy. Moreover, if this was not a list of alternative actions for the CBOT to consider, the plaintiffs do not adequately explain what it was or why it was faxed to the CBOT.

### C.   Private interests

The plaintiffs argue that the CBOT's other bad faith motive for adopting the Resolution was to advance the Board's private interests. However, there is no basis in the record to support such a finding. In order to avoid judgment as a matter of law through a showing of conflict of interest, "[p]laintiffs must make a showing first, that these potential conflicts actually influenced the votes of the board members, and if so, that any instances of bad faith on the part of individual members could 'be deemed to taint the entire Board's actions,'" *Minpeco*, 693 F. Supp. at 66 (citation omitted).

In *Minpeco*, the plaintiffs brought an action against a commodities exchange arguing that the exchange breached its duty to prevent manipulation of prices in connection with silver trading. The court found it undisputed that a number of the exchange's board members "were associated with businesses which either held net long silver positions, had net long customer accounts, or did business with the Hunt defendants . . . ." *Id.* at 69. Nonetheless, it granted the defendant's motion for summary judgment because there was insufficient evidence in the record that any of these business affiliations actually influenced any board member's action. "Bad faith cannot be inferred from these theoretical conflicts." *Id.* Moreover, the court found that even if an alleged conflict were proven, there was no evidence in the record that the conflict tainted the actions of the Board as a whole. *Id.*

We find ourselves in virtually the same situation today. The record shows that no director who voted on the Resolution actually owned or controlled any July soybean futures. App. at 260-62; 1008-10. The Resolution passed 16 to 1. App. at 266. Of the sixteen who voted for the Resolution, it appears that six directors were affiliated with clearing firms that had customer or house positions which were net short. App. at 881-82. However, there is no evidence in the record that these affiliations actually

influenced the vote of any of these six directors. *See Minpeco*, 693 F. Supp. at 69; *see also Sam Wong & Son, Inc.*, 735 F.2d at 661 n.12 (finding insufficient evidence of bad faith where some of the eleven board members present at the meeting were affiliated with firms having house and customer positions in the relevant contract). There is no evidence that any of these affiliated firms or their customers actually ended up benefiting from the Resolution. Finally, as in *Minpeco*, there is no evidence that the alleged conflict of the six directors tainted the actions of the other ten members of the board who voted in favor of the Resolution.[13] *Minpeco*, 693 F. Supp. at 69. The plaintiffs have shown "no more than the existence of the theoretical conflicts which 'inevitably taints the decisions of self-regulating exchange boards.'" *Id.* at 67 (citation omitted).

## III. CONCLUSION

Eleanor Roosevelt once said, "[d]o what you feel in your heart to be right—for you'll be criticized anyway. You'll be damned if you do, and damned if you don't." In this case, the Chicago Board of Trade "did," and as a result it has been "damned" with over ten years of litigation and the prospect of significant liability. However, we believe that had the Board not acted, it might have been "damned"

---

[13] The plaintiffs argue that if those board members affiliated with firms whose house or customer accounts were net short had re-cused themselves, the board would have been deprived of a quorum and therefore could not have adopted the Resolution. Such a strict recusal requirement, however, would be inconsistent with the self-regulatory nature of the CBOT and would make it virtually impossible for the Board ever to take action. *See Sam Wong & Son*, 735 F.2d at 672. In this case, no voting board member personally owned or controlled July soybean futures, and we can find no other basis on which any of the Board members should have been conflicted out of this vote. App. at 260-62, 1008-10.

anyway, as its inaction would have subjected it to claims from Cargill and others who might have been hurt by Ferruzzi. *See Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 780 (2d Cir. 1984) ("[W]e have recently made it clear that the bad faith requirement governs claims of both exchange action and *inaction*.") (citation omitted) (emphasis added). Although the price of soybeans in the cash market may have been temporarily depressed, we find no evidence that the CBOT's dominant motive in adopting the Resolution was held in bad faith. To the contrary, we believe that "[t]he acts of the defendants rather than being in restraint of commerce, were in aid of commerce in facilitating future trading on the market." *Cargill*, 164 F.2d at 823. For the foregoing reasons, we bring an era to an end and AFFIRM the district court's order of judgment as a matter of law.

A true Copy:

     Teste:

                     _____

                     *Clerk of the United States Court of Appeals for the Seventh Circuit*