In the

# United States Court of Appeals
## For the Seventh Circuit

No. 11-2426

ESTATE OF RUDY ESCOBEDO
(deceased) (Raquel Hanic, Personal
Representative of Estate),

*Plaintiff-Appellant*,

*v.*

OFFICER BRIAN MARTIN, ET AL.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 05 CV 0424—**Theresa L. Springmann**, *Judge.*

ARGUED MAY 31, 2012—DECIDED DECEMBER 13, 2012

Before MANION, KANNE, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* In the early morning hours of July 19, 2005, Rudy Escobedo became suicidal and ingested cocaine. He dialed 911 and told the operator he had taken cocaine, had a gun to his head, and wanted to kill himself. An emergency response team was dispatched to negotiate with Escobedo and to try to get him to put down his weapon and leave his apartment volun-

tarily. Negotiations proved unfruitful and the police opted to deploy a tactical response to remove Escobedo from his apartment, as they thought he presented a danger to the community around him. After deploying two volleys of tear gas into Escobedo's seventh-floor apartment, a team of six officers wearing gas masks and other protective equipment broke into the apartment. The officers found him holed up in his closet with a gun to his head. The officers ordered him to put down the weapon, but Escobedo did not comply and was shot by two of the police officers. Escobedo's Estate brought a § 1983 excessive force claim against the police and the City of Fort Wayne. After a variety of motions were filed and a partial summary judgment was granted and appealed, the case went to trial and the jury found in favor of the defendants. The district court also granted judgment as a matter of law in favor of the defendants after the jury entered its verdict. The Estate now appeals, and we affirm.

## I. BACKGROUND

### A. Escobedo calls 911

Early in the morning of July 19, 2005, Rudy Escobedo became suicidal and ingested cocaine. From his apartment in Fort Wayne, Indiana, he called his sister Renee and left a message telling her he loved her. He then called his other sister Regina and told her that he had done something stupid, that he was going to jail for a long time, and that he loved her. Shortly after 4:00 a.m., he dialed 911 and informed the dispatcher

that he had taken cocaine, had a gun to his head, and wanted to shoot himself. He claimed that the police were in his apartment, but also said that he was alone and that the police were outside his apartment and that he did not want them to enter. He stated that he did not want to hurt anyone, but would kill himself if the police entered his apartment. He gave the dispatcher the name and telephone number of his counselor, Dr. Jim Cates, and said he wanted "someone" to talk to. The dispatcher notified the police, and Officers Foust and Fairchild soon arrived at Escobedo's apartment. The apartment was located on the seventh floor of a building on West Berry Street in downtown Fort Wayne. St. Joseph Hospital was two blocks from his apartment, as was a church with a preschool and several other local businesses. Officer Foust knocked on Escobedo's door and received no answer, but he heard someone (presumably Escobedo) chamber a round into a handgun and move items around inside the apartment.

Sgt. C. M. Taylor, who had also been dispatched to Escobedo's apartment, arrived at 4:38 a.m. and spoke to Officers Foust and Fairchild, who briefed him on the efforts they had taken thus far to reach Escobedo. Sgt. Taylor attempted to speak to Escobedo through the apartment door, but received no response. He was finally able to reach Escobedo via cellphone at around 4:55 a.m., and Escobedo told Sgt. Taylor that he was a drug addict and high on cocaine. Escobedo reiterated that he wanted to die; that he had a gun to his head; that he did not want the police to enter his apartment; that he did not want to hurt the police but would kill himself if the police entered his

apartment; and that he wanted to speak to his therapist Dr. Cates. Sgt. Taylor told Escobedo that no one would try to break into his apartment or try to hurt him, and that Sgt. Taylor was there to help him.

### B. The Crisis Response Team arrives and begins negotiating with Escobedo

After this conversation, Sgt. Taylor and another officer who had arrived on the scene, Sgt. Michael Vorhies, made the decision to contact the Crisis Response Team ("CRT"), a division of the Fort Wayne Police Department that specializes in situations involving hostages and barricades, including situations where suicidal individuals barricade themselves. While waiting for the CRT, Sgt. Taylor directed several other officers to try to evacuate the other apartments on the seventh floor of Escobedo's building, but no one answered when the officers knocked. During this time, Sgt. Taylor continued to converse on and off with Escobedo.

Members of the CRT began arriving at 5:30 a.m., with Officer Bernie Ebetino arriving first. Officer Ebetino proceeded to the seventh floor and listened to Escobedo's conversation with Sgt. Taylor for a few minutes, and then took over negotiations. Other CRT members continued to arrive and assumed various roles: Detective Jonathan Bowers acted as the liaison between the negotiators on the seventh floor and the commanders outside the building; Officer Sofia Rosales kept a timeline of events for the CRT; Officer Victor Torres also served as a liaison but remained outside the building at the command post; Detective

Lorna Russell helped to coach Officer Ebetino during the negotiations; and Sgt. Hunter, the CRT commander, acted as an information relay between the negotiators and the commanders.

### C. The Emergency Services Team arrives as negotiations with Escobedo continue

Members of the Emergency Services Team ("EST") also began arriving on the scene.[1] Lt. Kevin Zelt, the EST commander, joined Sgt. Hunter at the scene, and both were under the direct command of Deputy Chief Martin Bender, who was the incident scene commander and had overall authority. Deputy Chief Douglas Lucker was on the scene as well and provided assistance to Deputy Chief Bender. Bender established a command center in the parking lot next to the apartment complex. He then ordered the officers present to form a perimeter around the building, and notified the nearby hospital that

---

[1] The Fort Wayne Police Department has two specific teams that are relevant to this case: The Crisis Response Team and the Emergency Services Team. These two teams work in tandem with specific complementary tasks: The CRT handles the negotiation side of situations involving hostages, barricades, and suicidal barricades; and the EST, similar to a typical SWAT unit, handles the tactical side of these situations. The EST team is trained to defuse such situations with tactical methods such as the use of tear gas, flashbang grenades, and other stun devices, and, when necessary, the use of force. Whenever the CRT is activated, the EST is also deployed.

an armed man was threatening to commit suicide in the building.

Sgt. Taylor, the officer who had first communicated with Escobedo, briefed Deputy Chief Bender on the situation and then left the scene, leaving his cellphone with Officer Ebetino. Deputy Chief Bender in turn briefed Lt. Zelt on the details of the situation, and Lt. Zelt deployed a three-man squad of snipers/observers to conduct visual surveillance of Escobedo. With the command center located outside the building and the negotiators located on the seventh floor of the building, it was necessary to develop a communication relay system to keep the commanders informed of the negotiation proceedings. To that end, a CRT officer on the seventh floor relayed information via a direct-link phone system down to Sgt. Hunter, who in turn passed that information on to the other command staff. When the CRT began using the direct-link phone, they stopped using Sgt. Taylor's phone to communicate with Escobedo and began using another officer's phone which was compatible with the direct-link system.[2]

---

[2] Officer Ebetino did not inform Escobedo of the switch after contacting him on the new phone, and Officer Ebetino did not provide Escobedo with the number of the new phone (though presumably it would have appeared on Escobedo's cellphone when Officer Ebetino called with the new phone). Later, after the negotiations with Escobedo had ceased, Escobedo attempted to call Sgt. Taylor's phone five times, but by that point the CRT had already evacuated

(continued...)

Officer Ebetino's plan during the negotiation was for Escobedo to put the gun down and leave his apartment so he could be taken into custody for an emergency mental health detention. Officer Ebetino employed various techniques used by negotiators to effect this plan: he tried to build rapport with Escobedo via active listening, tried to calm Escobedo, tried to build trust and empathy with him, and emphasized that the police were there to help Escobedo. Escobedo informed Officer Ebetino that he had received treatment by a psychiatrist, Dr. Cates, and Sgt. Hunter called Dr. Cates to learn more about Escobedo. Dr. Cates told Sgt. Hunter that Escobedo had a history of drug use and bipolar disorder, had a strained relationship with his family, and was difficult to deal with when high on drugs. Dr. Cates said that he did not think he could be of any help during the negotiations because Escobedo was difficult to deal with when using drugs, but he still offered to come to the scene. Sgt. Hunter relayed this information to Deputy Chief Bender, and Hunter decided not to ask Dr. Cates to come to the scene.

During the negotiations, Escobedo repeatedly discussed wanting to kill himself, but also repeatedly stated that he did not want to die. Escobedo discussed barricading his door, and Officer Ebetino heard furniture being moved inside. Later, Escobedo said that he was removing

(...continued)
their position on the seventh floor and left their equipment, including Sgt. Taylor's phone, behind.

the barricade. Escobedo also asked Officer Ebetino about getting medication and speaking with a counselor, and emphasized that he wanted to speak with Dr. Cates. He also talked about seeing his sister Renee, and Officer Ebetino responded by suggesting that Escobedo identify a hospital where he could meet his sister.

### D. As negotiations with Escobedo fall apart, the EST prepares a tactical solution

As the negotiations were ongoing, Lt. Zelt began to develop a tactical plan to remove Escobedo from his apartment. The plan included evacuating the building and then using tear gas and a tactical team. According to Lt. Zelt's testimony at trial, Zelt was concerned with the fact that Escobedo's weapon had a range of over one mile and that Escobedo was on the seventh floor of a building, which meant Escobedo "controlled the high ground." In developing his plan, Lt. Zelt reviewed Escobedo's criminal history, noting that he had several prior substance abuse arrests and convictions, including a recent felony arrest for which Escobedo was facing prison time.

By 8:00 a.m., Deputy Chief Bender learned that the negotiations with Escobedo were not progressing. Bender ordered Lt. Zelt to prepare his tactical team for firing tear gas into Escobedo's apartment to force him out. At trial, Bender testified that his decision to employ a tactical plan resulted from his consideration of the safety of his officers, of the public, and of Escobedo

himself. Officer Ebetino, however, continued to negotiate with Escobedo while Lt. Zelt and his team prepared the tactical plan. According to Officer Ebetino's testimony at trial, Ebetino believed that he was making no progress with Escobedo and that Escobedo became increasingly irrational over the three hours that Ebetino had spent trying to coax Escobedo to put his gun down and exit his apartment voluntarily.

### E. The EST fires tear gas into Escobedo's apartment

At 8:28 a.m., Escobedo threatened to come out of the apartment with his gun in his hand, and indicated to Officer Ebetino that he had a knife as well. Two minutes later, Escobedo stated he would come out of his apartment in three minutes. Deputy Chief Bender, who was ready to order the use of tear gas, held off to see if Escobedo would come out of the apartment as he had promised, but Escobedo did not exit his apartment. Deputy Chief Bender then ordered the tear gas to be fired into Escobedo's apartment. All of the commanders who participated in the decision to deploy a tactical response (Deputy Chief Bender, Deputy Chief Lucker, Lt. Zelt, and Sgt. Hunter) testified that the primary reason for using tear gas to remove Escobedo from the apartment stemmed from their belief that further negotiations would be fruitless.

Officer Ebetino terminated negotiations with Escobedo and the CRT had no further contact with him. The negotiators evacuated the seventh floor of the building as Lt. Zelt sent three officers to the street below Escobedo's

window to position them to fire tear gas up through the windows of the apartment. While these officers were positioning themselves, a "take down team" led by Sgt. Selvia placed themselves in the hallway of the seventh floor outside of Escobedo's apartment. They put on gas masks in preparation for the tear gas deployment, and were ready to respond if Escobedo exited the apartment after the tear gas was deployed.

Escobedo did not exit the apartment. Sgt. Selvia and other members of the team could hear Escobedo coughing, and repeatedly shouted for Escobedo to put down his gun and come out. Escobedo did not respond, and after ten minutes, Lt. Zelt ordered a second volley of tear gas to be fired into the apartment. Once again, Sgt. Selvia and the other members of the take down team shouted for Escobedo to come out of the apartment, but they heard nothing in response.

### F.   The team breaches Escobedo's apartment door

After waiting an additional ten minutes, Lt. Zelt ordered the officers to enter the apartment. Zelt ordered Sgt. Selvia to employ a "breach & delay" tactic whereby Selvia and the other members of the team rammed the door open and tossed an aerosol canister containing tear gas into the first room of Escobedo's apartment. By this point, Sgt. Selvia's team was comprised of Sgt. Shane Lee and Officers Derrick Westfield, Scott Straub, Jason Brown, and Brian Martin. The team waited for over a minute for a response, but when there was none, Lt. Zelt ordered Sgt. Selvia to use a second tear gas canister.

Lt. Zelt then ordered the officers to enter the apartment. The officers tossed a "flashbang" grenade, a distraction device that emits a loud noise and a bright flash, into the room before entering it. The effects of a flashbang, designed to temporarily disable and blind a suspect, last between two and eight seconds, providing officers sufficient time to gain control over a room. The flashbang ignited some of the propellant from the tear gas canisters and caused a small fire. The officers entered the room, put out the fire, and quickly searched the living room and adjoining kitchen, determining that Escobedo was not in the common area. They saw that the bedroom door was closed, and decided that Escobedo must be in the bedroom.

### G. The team enters the bedroom and Officers Martin and Brown shoot Escobedo

When the team tried to open the bedroom door, they found it was barricaded, and they had to use the ram to force the door open, breaking the door in half in the process. Officer Straub then threw a second flashbang over the barricade and into the bedroom. The flashbang detonated in the closet, where Escobedo was sitting, approximately one to two feet away from Escobedo's head.

After the flashbang detonated, the officers attempted to enter the room, but were slowed by the barricade. Eventually they navigated the obstacle and spread out through the room, shouting for Escobedo to drop his gun and surrender. Officer Martin spotted Escobedo

sitting in his closet with a gun to his head. Escobedo yelled out that he had a gun, and Martin in turn yelled to the team, "He's got a gun!" At this point, Officer Martin was approximately four to six feet in front of Escobedo, who was sitting in the closet with his legs extended in front of him. Officer Brown stepped in next to Martin on Martin's left. Officer Martin was armed with his service revolver, and Officer Brown was armed with a Sage, a weapon that fired rubber bullets.

At trial, Officer Martin testified that he repeatedly shouted at Escobedo to drop the gun, but instead of doing so, Escobedo lowered his gun from his head and pointed it at Martin. Martin then fired his service revolver at Escobedo several times, and Brown opened fired with his Sage as well. After being struck by bullets, Escobedo slumped forward, and Martin fired a second volley at Escobedo because he believed Escobedo was reaching for the gun, which Escobedo had dropped after the first bullets struck him. Martin ultimately shot Escobedo nine to eleven times. Officer Brown also fired his Sage, hitting Escobedo with six rubber bullets. After the second volley, Officer Martin approached the closet to get Escobedo's gun. As he was reaching down to retrieve the gun, Martin bumped his head on the closet's doorjamb, which broke the seal on his gas mask. He was able to grab the gun and then left the apartment, overcome by the tear gas. Paramedics were summoned to the room, and they pronounced Escobedo dead at 8:59 a.m.

### H. The Estate files suit, the defendants file for summary judgment, and partial summary judgment is granted and appealed

After Escobedo's death, his Estate, via its representative Raquel Hanic, filed a complaint on December 20, 2005, against the City of Fort Wayne, Officers Martin, Brown, Westfield, Straub, and Ebetino; Sgts. Selvia, Hunter, and Shane Lee; Lt. Zelt; and Deputy Chiefs Bender and Lucker, alleging, inter alia, that the defendants used excessive force against Escobedo. In January 2007, the Estate filed a motion to dismiss Lee and Westfield from the case, which was granted. Shortly thereafter, the remaining defendants moved for summary judgment, raising a defense of qualified immunity. In May 2008, the district court granted in part and denied in part the defendants' motion for summary judgment. Specifically, the district court granted summary judgment: (1) for Officer Ebetino on all claims against him, thus dismissing him from the case; (2) for Officers Martin and Brown on the Estate's excessive force claim for shooting Escobedo; (3) for the defendants on the Estate's failure to train claim; (4) for the defendants on the Estate's warrantless entry claim; (5) for the defendants on the Estate's substantive due process claim; and (6) for the defendants on the Estate's wrongful death claim.

The district court denied the defendants' summary judgment motion with respect to: (1) the Estate's excessive force claim against the officers for firing tear gas into Escobedo's apartment; (2) the Estate's supervisory liability claim against Deputy Chiefs Bender and

Lucker, Lt. Zelt, and Sgt. Hunter, for ordering tear gas to be fired into Escobedo's apartment; (3) the Estate's excessive force claim against the entry team (Sgt. Selvia and Officers Straub, Martin and Brown) for using tear gas canisters and flashbangs during the raid on Escobedo's apartment and bedroom; and (4) the supervisory liability claim against Deputy Chiefs Bender and Lucker, Lt. Zelt, and Lt. Hunter for the entry team's raid on Escobedo's apartment.

Shortly after the district court's ruling, the defendants filed a notice of appeal from the denial of qualified immunity for their decision to use tear gas to extricate Escobedo from his apartment and to use tear gas canisters and flashbang grenades to enter his apartment. The Estate also filed a motion for reconsideration of the summary judgment order in August 2008, which the district court denied. The Estate then filed a notice for certification of interlocutory appeal, which the district court granted, and the Estate petitioned this court for an interlocutory appeal, which we denied in October 2008. After denial, the Estate filed a petition for rehearing and for rehearing en banc, which we also denied.

Though we denied the Estate's petition for an interlocutory appeal, we addressed the defendants' appeal from the district court's denial of their qualified immunity defense. The only issue before this court on that appeal was whether the district court erred in finding that the officers were not entitled to qualified immunity for their decision to use tear gas canisters to extricate

Escobedo from his apartment and to use tear gas and flashbang grenades to enter his apartment. In April 2010, we issued our opinion affirming the district court's denial of qualified immunity to Deputy Chiefs Bender and Lucker, Lt. Zelt, Sgts. Hunter and Selvia, and Officers Martin, Brown, and Straub. The defendants filed a petition for rehearing and rehearing en banc, which we denied in May 2010. The defendants then filed a petition for a writ of certiorari to the Supreme Court of the United States, which the Court denied in October 2010.

## I.   The jury trial and judgment as a matter of law

The case proceeded to an eight-day jury trial in the district court on the remaining claims—namely, the excessive force claims against Deputy Chiefs Bender and Lucker, Lt. Zelt, Sgts. Hunter and Selvia, and Officers Martin, Brown, and Straub for the entry into Escobedo's apartment and the use of tear gas canisters and flashbang grenades during entry. The trial began on February 8, 2011, and at the close of the Estate's case in chief, all of the defendants moved for judgment as a matter of law on qualified immunity grounds. The district court granted judgment as a matter of law in favor of Sgt. Selvia and Officers Straub, Martin, and Brown, but took the motion by the remaining defendant commanders[3] under advisement. The trial proceeded against defend-

---

[3] We frequently refer to Deputy Chiefs Bender and Lucker, Lt. Zelt, and Sgt. Hunter collectively as the "defendant command-

(continued...)

ant commanders, and at the close of all evidence, the defendants renewed their motion for judgment as a matter of law, which the district court again took under advisement. On February 17, 2011, the jury returned a verdict in favor of the defendant commanders, exonerating them on all claims. In May 2011, the district court granted judgment as a matter of law in favor of the defendant commanders on qualified immunity grounds.[4] Final judgment was entered in May 2011, and this appeal followed.

--------

(...continued)

ers" because each of them held a position of command during the Escobedo standoff. Deputy Chief Bender had overall command authority, Deputy Chief Lucker advised him, Lt. Zelt was in charge of the EST and put together the tactical plan to enter Escobedo's apartment, and Sgt. Hunter was in charge of the CRT, which handled negotiations with Escobedo.

[4] This case presents the rare instance where judgment as a matter of law on qualified immunity grounds is granted after a jury verdict. The Supreme Court has "'stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (internal citations omitted). Here, prior to trial the record was not sufficiently developed to grant qualified immunity to the defendants. As facts came to light at the trial, it became appropriate to grant qualified immunity to Officers Straub, Martin and Brown at the close of the Estate's case, and later to grant qualified immunity to the defendant commanders after the jury verdict in their favor.

## II. DISCUSSION

The Estate urges us to reverse the district court on the basis of five separate arguments. First, the Estate argues that the jury verdict in favor of the defendants should be reversed because the district court admitted evidence unknown to the officers at the time they used force against Escobedo. Second, the Estate contends that the district court erred when it held as a matter of law that the defendant commanders' order to use force did not proximately cause Escobedo's death, thus preventing the jury from considering the Estate's wrongful death claim. Third, the Estate urges us to reverse the district court's grant of judgment as a matter of law to the defendant commanders on qualified immunity grounds because the district court improperly weighed evidence and concluded that Escobedo posed a threat to the public. Fourth, the Estate seeks reversal of the district court's grant of judgment as a matter of law to Officer Straub on qualified immunity grounds because the district court improperly weighed the evidence and determined that Officer Straub did not recklessly throw a flashbang grenade near Escobedo. Finally, the Estate argues that we should reverse the district court's grant of summary judgment to Officers Martin and Brown because the district court improperly resolved conflicting credibility issues in the officers' favor. We address each argument in turn.

**A. The district court did not improperly admit evidence unknown to the officers at the time they used force against Escobedo**

A trial court's evidentiary rulings are reviewed for an abuse of discretion. *Hollins v. City of Milwaukee*, 574 F.3d 822, 828 (7th Cir. 2009). As we have observed, the losing party at trial "carries a heavy burden in challenging a trial court's evidentiary rulings on appeal because a reviewing court grants substantial deference to the evidentiary rulings of the trial court." *Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997) (quotations omitted). "Under the applicable standard of review, . . . reversal is warranted 'only when the trial judge's decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based that decision, or where the supposed facts found are clearly erroneous.'" *Id.* (quoting *Wheeler v. Sims*, 951 F.2d 796, 802 (7th Cir. 1992)). And even if we find that the district court erred on an evidentiary ruling, we will not disturb the judgment of the district court unless the erroneous ruling had a "substantial influence over the jury." *United States v. Fairman*, 707 F.2d 936, 941 (7th Cir. 1983) (citations omitted).

The Estate challenges the jury verdict, arguing that the district court erred in admitting evidence unknown to the officers at the time of the shooting. Specifically, the Estate argues that the district court should not have allowed the defendants to introduce the following evidence: (1) Escobedo's upcoming court date and potential

five-year prison sentence for his recent substance abuse violations; and (2) a psychological profile of Escobedo done in 1999 by Dr. Cates. The defendants counter that the Estate opened the door to such evidence when Escobedo's sister Regina Lawson (the Estate's first witness) testified regarding Escobedo's state of mind prior to the shooting. The defendants also argue that Cates's psychological assessment of Escobedo was relevant to Escobedo's mental state at the time of the shooting.

In challenging the district court's evidentiary ruling, the Estate relies on our holding *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1998), arguing that *Sherrod* precludes the admission of evidence unknown to an officer at the time force is used and is therefore presumptively prejudicial. The Estate reads *Sherrod* too broadly. There, we clarified that "[k]nowledge of facts and circumstances gained after the fact . . . has no place in the trial court's or jury's proper post-hoc analysis of the reasonableness of the actor's judgment. Were the rule otherwise . . . the jury would possess more information than the officer possessed when he made the crucial decision." *Id.* at 805. We cautioned, however, against an overly broad reading of that holding, noting that the decision "should not be interpreted as establishing a black-letter rule precluding the admission of evidence which would establish [for example] whether the individual alleging a § 1983 violation was unarmed at the time of the incident." *Id.* at 806. And we emphasized that evidence unknown to officers at the time they used force is admissible to

attack witness credibility and to impeach witnesses by showing contradictions or discrepancies in testimony. *Id.*

Furthermore, evidence unknown to officers at the time force was used is also admissible to add credibility to an officer's claim that a suspect acted in the manner described by the officer. We recently held in *Common v. City of Chicago*, 661 F.3d 940 (7th Cir. 2011), that "[a]s the *Sherrod* court noted, . . . where the facts are controverted in a reasonable force case, impeachment by contradiction is allowed." *Id.* at 946. In *Common*, officers observed robbery suspects exiting a store, and the officers ordered the men to stop and show their hands. *Id.* at 942. One suspect, Michael Smith, failed to comply, and grabbed for an officer's wrist as the officer was drawing his revolver. *Id.* The officer shot Smith in the chest, and after Smith died, his estate brought a wrongful death claim against the officer. An autopsy had revealed that Smith had several bags of cocaine in his chest cavity and trachea, and after a sidebar discussion, the district court allowed that evidence to be admitted at trial, even though the officer did not know that information when he used force against Smith. *Id.*

The jury found in favor of the officers, and Smith's estate appealed. Relying on *Sherrod*, Smith's estate argued that the drug evidence was inadmissible because the officer did not know about it when he shot Smith. We upheld its admission, however, reasoning that

> [t]he packets of drugs in Smith's mouth made it more likely that Smith acted in the way that Officer Nelson

contended he acted as opposed to the way that other witnesses contended he did. . . . The evidence was used to rebut the plaintiff's argument that Smith exited the store and immediately complied with the officer's direction to put his hands in the air. It was also used to demonstrate that Smith had a motive to turn away from the officer to conceal the drugs and then attempt to gain control of Officer Nelson's weapon.

*Id.* at 947.

This reasoning is analogous to the facts here. When the Estate called Escobedo's sister Regina Lawson to the stand, she testified that Escobedo was in good spirits and excited about what was happening in his life prior to the shooting. The morning he was shot, however, Escobedo called his sister before dialing 911 to tell her that he did something stupid and was going away for a long time. The defense sought to cross-examine Lawson about Escobedo's state of mind, that he had pending criminal charges for habitual substance abuse, that he was facing a plea hearing two days after he was shot, and that his proposed plea agreement included a five-year prison sentence. The Estate objected to the line of questioning, and at sidebar conference, the defense argued that the Estate opened the door to the subject of the pending criminal charges when it asked Lawson about Escobedo's state of mind prior to the shooting. The district court correctly ruled that because Lawson already testified about her brother's demeanor and state of mind, "the defense does have an opportunity to now examine it on cross to determine whether or not

this witness was aware that Mr. Escobedo had these other events and situations in his life at this same approximate time. . . . They have a right to cross on that, because one of the contentions is Mr. Escobedo's state of mind as it relates to the damages claim by [the Estate]."

"When a party opens the door to evidence that would be otherwise inadmissible, that party cannot complain on appeal about the admission of that evidence." *Griffin v. Foley*, 542 F.3d 209, 219 (7th Cir. 2008) (quotations omitted). And when a party puts evidence at issue, that party must "accept the consequence[s]" of opening the door to that evidence. *S.E.C. v. Koenig*, 557 F.3d 736, 740-41 (7th Cir. 2009). The Estate opened the door to evidence concerning Escobedo's state of mind when it questioned Lawson about it, and *Sherrod* does not bar the admission of Escobedo's pending criminal charges even though Officers Martin and Brown did not know about Escobedo's potential prison sentence.[5] Just as we ruled in *Common*, the Estate's contention that Escobedo would have put down his gun and voluntarily exited his apartment if he had only been given more time is contradicted by the evidence of his upcoming prison sentence. Indeed, Escobedo's fear of prison adds credibility to the

---

[5] One of the defendants, Lt. Zelt, the EST commander who ordered Martin and the other team members to enter Escobedo's apartment, testified at trial that he knew of Escobedo's criminal record, upcoming court date, and possible prison sentence. Lt. Zelt stated that he had reviewed Escobedo's criminal record and saw the information concerning his recent felony arrest and past history of substance abuse.

testimony of Officers Martin and Brown, who testified that Escobedo did not put down his gun despite being repeatedly ordered to, and instead pointed it at Martin and Brown. Furthermore, the evidence was admissible to show Escobedo's state of mind while he was in his apartment and helps to show why the negotiations with Escobedo did not seem to be proceeding. And the defendants used this evidence to impeach Lawson's testimony that her brother was in good spirits prior to the shooting. Thus, the district court did not err when it allowed the defendants to introduce this evidence.

Likewise, the district court did not err when it allowed the defendants to introduce Dr. Cates's 1999 psychological assessment of Escobedo. Similar to its arguments concerning Escobedo's pending criminal sentencing, the Estate argues that Dr. Cates's psychological assessment was not available to the officers during the confrontation with Escobedo, nor did Dr. Cates provide Sgt. Hunter with any of the information contained in the assessment when Sgt. Hunter spoke with Dr. Cates during the negotiations. The assessment, done in 1999 when Dr. Cates first began treating Escobedo, revealed that Escobedo was bipolar, was subject to unpredictable mood swings, and had considerable substance abuse issues. Over the Estate's objection, the district court permitted Dr. Cates to testify about the psychological assessment because it was "relevant with respect to the mental state that Mr. Escobedo presented at the time of this incident, to the extent that it gives a history and background, albeit, going back to 1999, it is still relevant to what Mr. Escobedo brought into this

police incident in 2005." The court also noted that the assessment provided "additional background context and understanding for the facts to which this witness [Cates] has been called to the stand now regarding his contact with the police, and the statements that were made to the police upon which the police in part acted."

The Estate relies on our holdings in *Wallace v. Mulholland*, 957 F.2d 333 (7th Cir. 1992), and *Rascon v. Hardiman*, 803 F.2d 269 (7th Cir. 1986), to argue that evidence regarding the mental health state of an individual that is unknown to officers is inadmissible in an excessive force case. However, neither case is applicable to the facts here because each case involved attempts to introduce evidence of mental illness to show that force *might* be needed to deal with the individual in question. Unlike in *Wallace* and *Rascon*, here the defendants introduced the evidence about the psychological assessment not to show that Escobedo might be aggressive when the officers entered his room, but rather to explain Dr. Cates's previous testimony regarding his statements via phone to Sgt. Hunter during the standoff—to wit, that Escobedo was difficult to deal with when high on cocaine, and that Dr. Cates would not have been of any assistance during the negotiations. For that reason, the district court did not err when it admitted Dr. Cates's testimony about the 1999 psychological assessment concerning Escobedo's mental health.

B. **The district court committed harmless error when it prohibited the Estate from introducing evidence at trial of Escobedo's death for purposes of calculating damages**

After the district court's summary judgment order, there remained § 1983 claims against the defendant commanders for excessive force for ordering the use of tear gas and for ordering the EST to enter Escobedo's apartment using flashbangs and additional tear gas. At trial, the Estate sought to introduce evidence that the defendant commanders' decision proximately caused Escobedo's death. The district court prohibited it from doing so, and on appeal, the Estate argues that the district court's refusal to allow it to pursue its theory prejudiced the Estate's case and resulted in an unfair trial. Essentially, the theory the Estate wished to pursue at trial runs as follows: The defendant commanders decided to end negotiations and deployed tear gas and the EST against Escobedo. As a result, they set off a chain of events that substantially increased the risk that Escobedo would be harmed or killed by the EST, and thus proximately caused Escobedo's death.

The Estate's argument is incorrect. Under § 1983, the defendant commanders could have been held liable for setting off a chain of events that led to a violation of Escobedo's constitutional right to be free from excessive force, not for his death.[6] *See Jones v. City of Chi.*,

---

[6] The Estate continually referred to its theory as its "wrongful death" claim against the defendant commanders, but then stated

(continued...)

856 F.2d 985, 992-93 (7th Cir. 1988) (discussing the liability of supervisors in the context of violations of constitutional rights); *see also Robertson v. Wegmann*, 436 U.S. 584, 589-90 (1978) ("As we noted . . . one specific area not covered by federal law is that relating to the survival of civil rights actions under § 1983 upon the death of either the plaintiff or defendant.") (citations and quotations omitted); *McAllister v. Price*, 615 F.3d 877, 882 (7th Cir. 2010) (under the Fourth Amendment, the injury or death of an individual does not affect the substance of a § 1983 claim for excessive force, but rather is relevant as evidence of the reasonableness of the force). Thus, the district court was correct in prohibiting the Estate from arguing that the defendant commanders' decision proximately caused Escobedo's death, and it properly instructed the jury to consider whether the defendant commanders' actions led to a violation of Escobedo's *constitutional rights*, rather than whether those actions led to Escobedo's *death*.

---

(...continued)
in its Reply Brief that "Plaintiff has used 'wrongful death' as short-hand to refer to her argument that liability for Escobedo's death should be imposed on the Defendant-Commanders for the use of tear gas and flash-bangs. This was not intended as an assertion that this was a separate substantive claim." [App. Rep. Br. at 16 n.2.] The Estate also acknowledged that "[t]here is no such thing as a claim under the Fourth Amendment for 'wrongful death.'" [App. Rep. Br. at 15.] Unfortunately, this belated acknowledgment caused unnecessary confusion before, during, and after the trial.

The district court committed harmless error, however, when it prohibited the Estate from introducing evidence of Escobedo's death for purposes of calculating the damages that resulted from the violation of Escobedo's constitutional rights (if the jury were to find that Escobedo's rights were in fact violated). We have held that an "estate bringing a decedent's § 1983 claims may seek damages allowable under a state wrongful death statute." *Ray v. Maher*, 662 F.3d 770, 774 (7th Cir. 2011). Indiana permits recovery for damages caused by an individual's wrongful acts or omissions that led to the decedent's death, including "[r]easonable medical expenses, hospital, funeral, and burial expenses . . . ." Ind. Code. § 34-23-1-2(c). Thus, if the defendants' acts were found to be excessive, the Estate would have been allowed to present evidence of Escobedo's death to demonstrate the full scope of the injuries he sustained and to advance its theory that the defendant commanders proximately caused those injuries. *See Guzman v. City of Chi.*, 689 F.3d 740, 745-46 (7th Cir. 2012) ("[L]iability must be resolved before the question of damages is reached."); *see also Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002) ("[T]he ordinary rules of tort causation apply to constitutional tort suits."); *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999) ("[A] plaintiff must demonstrate both that he has suffered an 'actual' present injury and that there is a causal connection between that injury and the deprivation of a constitutionally protected right caused by a defendant.").

Here, however, the error was harmless because the jury exonerated the defendant commanders of any liability.

Thus, the jury did not need to determine whether the defendant commanders' decision to use force against Escobedo proximately caused Escobedo's damages. *See Guzman*, 689 F.3d at 745. Because we hold that the district court's error was harmless, we decline to vacate the jury's verdict and order a new trial.

**C. The district court did not err when it granted judgment as a matter of law on qualified immunity grounds to the defendant commanders**

We next consider the Estate's challenges to the district court's grant of judgment as a matter of law to the defendant commanders on the basis of qualified immunity. We review de novo a district court's grant of judgment as a matter of law. *Zimmerman v. Chi. Bd. of Trade*, 360 F.3d 612, 623 (7th Cir. 2004). Judgment as a matter of law is appropriate when there is "no legally sufficient evidentiary basis for a reasonable jury" to find for the non-moving party. *Id.* We do not weigh the evidence or the credibility of the witnesses, but "there must be more than a mere scintilla of evidence" in support of the non-moving party's case to justify reversing the grant of judgment as a matter of law. *Id.*

The district court's grant of judgment as a matter of law in favor of the defendant commanders on qualified immunity grounds came after the jury found that none of the defendant commanders violated Escobedo's consti-

tutional right to be free from excessive force.[7] The district court granted qualified immunity to the defendant commanders based on their decision, after three hours of unsuccessful negotiations by the CRT with Escobedo to persuade him to put down his gun and exit his apartment, to use a tactical response to remove him from the apartment. The district court's decision also granted qualified immunity to the defendant commanders with respect to their decisions to allow the entry team to use tear gas and flashbang grenades when the team entered Escobedo's apartment. The district court ruled that the Estate had failed to show that reasonable officers would have acted differently under the circumstances.

We review the validity of a qualified immunity defense de novo. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). Because there was a jury verdict in favor of the defendant commanders prior to the grant of judgment as a matter of law, we construe the evidence in the light most favorable to them. *See Jarrett v. Town of Yarmouth*, 331 F.3d 140, 147 (1st Cir. 2003), *cert. denied*, 540 U.S. 1017 (2003) ("When a qualified immunity defense is pressed after a jury verdict, the evidence must be construed in the light most hospitable to the party that prevailed at trial . . . and deference should be accorded to the jury's discernible resolution of disputed factual issues.") (internal quotations omitted).

Qualified immunity shields government officials from liability under Section 1983 "for actions taken while

---

[7] As we noted above, this is unusual, but the district court was free to do so under Fed. R. Civ. P. 50(a)(2) and (b)(3).

performing discretionary functions, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1022 (7th Cir. 2000). It protects "all but the plainly incompetent or those who knowingly violate the law. . . . If officers of reasonable competence could disagree on the issue [of whether or not an action was constitutional], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). When performing discretionary functions, governmental actors accused of using excessive force are entitled to qualified immunity and are thus shielded from liability, unless the plaintiff can show a violation of a constitutional right and demonstrate that the right in question was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

When analyzing a qualified immunity defense, courts consider whether the facts alleged demonstrate a constitutional violation, and whether the constitutional right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Escobedo I*, 600 F.3d at 779 ("For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.") (quotations omitted).

Once the defense of qualified immunity is raised, "it becomes the plaintiff's burden to defeat it." *Wheeler v.*

*Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). Thus, the Estate has the burden to show that Escobedo had clearly established rights that the defendants violated. *Boyd v. Owen*, 481 F.3d 520, 526 (7th Cir. 2007); *see also Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) ("Although nominally an affirmative defense, the plaintiff has the burden to negate the assertion of qualified immunity.").

The district court granted judgment as a matter of law on qualified immunity grounds to the defendant commanders on the second prong, finding that Escobedo did not have a clearly established constitutional right to be free from the deployment of the Emergency Services Team, the use of tear gas, or the use of flashbang grenades because there was a lack of clearly existing law regarding their use and because no "patently obvious" violations occurred. The district court had initially denied qualified immunity to the defendant commanders at the summary judgment stage (and we affirmed that denial, *see Escobedo I*, 600 F.3d at 770). Specifically, regarding the use of tear gas, this court in *Escobedo I* stated that it was clearly established that the use of tear gas is unreasonable "when the individual does not pose an actual threat." *Id.* at 783. At summary judgment, the issue of whether Escobedo posed an actual threat was unclear—potential traffic problems and officer fatigue appeared to be the defendant commanders' only concerns. *Id.*

However, facts emerged at trial that caused the district court to conclude that "the police had a much greater concern that Escobedo was an imminent threat to others,"

thus changing its conclusion on the qualified immunity question. The district court based this finding on several factors: Escobedo was on the seventh floor of a building that was surrounded by other buildings, including a hospital and a church with a daycare center; Escobedo occupied an elevated position wielding a handgun with a long effective range; and the commanders' expressed desire that the tactical solution take place after most of the morning rush hour had finished.

The Estate's challenge centers on whether the defendant commanders were entitled to qualified immunity for ending negotiations and initiating a tactical response that included the use of tear gas and flashbang grenades. Its argument hinges on its contention that Escobedo did not present an actual danger. The Estate attempts to use the testimony of Deputy Chief Bender, Lt. Zelt, and the other commanders to show that any danger Escobedo posed was purely hypothetical (e.g., Deputy Chief Bender testified that there was a *possibility* that Escobedo had other firearms and that it was *possible* that Escobedo could go into an "active shooting mode" or "could possibly discharge a weapon," etc.). But the only proof the Estate offers in support of its argument is that Escobedo repeatedly said that he did not want to harm anyone and that he in fact did not harm anyone. Negotiations had been ongoing for nearly four hours when Deputy Chief Bender, after considering that Escobedo was high on cocaine, was wielding a powerful handgun with a long range, and had a clear view of the surrounding buildings, gave the order for Lt. Zelt to prepare a tactical response. The district court thus correctly concluded that

"the trial record shows that the police had a much greater concern that Escobedo was an imminent threat to others" than was apparent at the summary judgment stage of the proceedings.

The Estate also attacks the decision to use tear gas against Escobedo, but both the defendants' expert witness, Ronald McCarthy, and the Estate's expert witness, Larry Danaher, testified that once a decision to employ a tactical solution is made, the next appropriate step is to use tear gas. Danaher also testified that the decision to move from negotiations to a tactical solution requires an exercise in judgment by the commanders at the scene, and once that decision was made, Lt. Zelt's tactical plan and its execution by the team was proper. The district court quoted Deputy Chief Bender's trial testimony at length, citing to the multiple public safety factors he considered when deciding to use tear gas. Because of those safety concerns, the district court concluded that "Escobedo did not have a clearly established right to be free from the deployment of tear gas." The evidence the district court relied on when it granted summary judgment in favor of the defendant commanders on qualified immunity grounds demonstrates that a reasonable commander could believe that Escobedo posed an actual threat, and that decision is precisely what qualified immunity protects. Thus, the district court did not err when it granted judgment as a matter of law in favor of the defendant commanders after the jury verdict in favor of the defendants.

The Estate also argues that the district court erred in ruling that the defendant commanders had qualified

immunity regarding the amount of tear gas used. Its challenge centers on the fact that as much as twelve times the incapacitating level of tear gas was deployed against Escobedo. At trial, however, Lt. Zelt and the experts testified that "an incapacitating level of tear gas" is a misleading unit. Zelt testified that tear gas is "incapacitating" when an individual can no longer remain inside a structure. Danaher, the Estate's own expert, testified that tear gas is frequently used by police in barricaded suspect situations and that an "incapacitating" amount of tear gas means an amount sufficient to make the suspect feel uncomfortable but not render him unconscious. McCarthy, the defendants' expert, agreed, noting that the calculation of an incapacitating level was an old mathematical formula and that it would not have any bearing on determining whether the amount of tear gas used in a given situation was reasonable under the circumstances. McCarthy also testified that the study that had been done to determine how much tear gas constituted an "incapacitating" amount had been "thoroughly discredited." And the fact remains that, despite the large amount of tear gas deployed against Escobedo, he did not exit his apartment but instead sat down in his closet behind a barricaded door. For these reasons, the evidence presented at trial supports the district court's conclusion that reasonable commanders could have believed that the amount of tear gas used here was appropriate under the circumstances. Therefore, the district court did not err when it ruled that the defendant commanders were entitled to qualified immunity.

The Estate also challenges the commanders' decision to use flashbang devices, again arguing that Escobedo was

not dangerous. The Estate looks to our opinion affirming the district court's summary judgment decision denying qualified immunity to the defendant commanders, where we held that the use of a flashbang was an unreasonable use of force when

> it was clearly established as of July 19, 2005, that throwing a flash bang device blindly into an apartment where there are accelerants, without a fire extinguisher, and where the individual attempting to be seized is not an unusually dangerous person, is not the subject of an arrest, and has not threatened to harm anyone but himself [. . .].

*Escobedo I*, 600 F.3 at 786. The key language here is "not an unusually dangerous person." When we affirmed the district court's summary judgment ruling, the facts concerning the degree of danger Escobedo presented were not nearly as developed as they were after trial. The district court concluded that the evidence at trial showed that Escobedo did in fact pose an actual threat, and granted qualified immunity to the commanders on that basis. In addition to the evidence noted above, the district court also cited to Lt. Zelt's testimony regarding his concerns about Escobedo's hallucinations. Several times during his conversation with the negotiators, Escobedo stated that police were inside his apartment or right outside his window. Lt. Zelt testified that it was possible that Escobedo might shoot at the imaginary officers and strike someone outside the apartment. Escobedo also told negotiators that he had a knife in addition to his firearm, thus making him potentially

more dangerous, and that he might come out of the apartment with his gun. The Estate's expert Danaher conceded that if Escobedo did exit the apartment with his gun, that would increase the likelihood that an innocent bystander could be shot. And even if Escobedo never intended to harm anyone but himself, the fact that he barricaded himself into his apartment made him dangerous to anyone attempting to enter the apartment to remove him from it. Danaher testified that, because Escobedo had barricaded himself, he created a "fatal funnel"—the area of an entryway where a tactical team might be shot at as they are coming through the door. Danaher agreed that it was appropriate for officers to use flashbangs to disorient a suspect wielding a gun to give officers time to get through the door and avoid being shot. He further agreed that because the door was barricaded, it was appropriate for the team to use a flashbang prior to entering the bedroom.

In light of this evidence, the district court observed that the trial testimony "provided a clear picture of a potential threat Escobedo posed even though he did not make any explicit verbal threats against others. Even though Escobedo did not issue any explicit verbal threats to the public or the police, the court finds that Escobedo was unusually dangerous and thus did not have a clearly established constitutional right to be free from the use of flashbangs." For these reasons, the district court did not err when it granted qualified immunity to the defendant commanders regarding the use of flashbang grenades against Escobedo.

### D. The district court did not err when it granted judgment as a matter of law on qualified immunity grounds to Officer Straub

All of the defendants moved for judgment as a matter of law at the close of the Estate's case, and at this point the district court granted judgment as a matter of law in favor of all the team members who entered Escobedo's apartment (Officers Martin, Brown, and Straub, and Sgt. Selvia). Of those defendants, the Estate challenges only the district court's grant of judgment as a matter of law to Officer Straub on his use of the second flashbang when the team entered Escobedo's bedroom. The standard of review articulated above remains the same: we review de novo a district court's grant of judgment as a matter of law, and it is appropriate when there is "no legally sufficient evidentiary basis for a reasonable jury" to find for the non-moving party. *Zimmerman*, 360 F.3d at 623. However, because the district court granted judgment as a matter of law in favor of Officer Straub at the close of the Estate's case (and thus prior to the jury verdict in favor of the defendant commanders), we construe the evidentiary record in the non-moving party's favor (here, the Estate's). *See id.* The Estate argues that the district court improperly weighed the evidence and should have found that Straub's use of the second flashbang before breaching Escobedo's bedroom constituted excessive force. We disagree.

The Estate's argument turns on the fact that Straub threw the flashbang into the bedroom without first determining where Escobedo was located in the room. The Estate

relies on our opinion in the first appeal of this case, where we suggested that

> the use of a flash bang grenade is reasonable only when there is a dangerous suspect and a dangerous entry point for the police, when the police have checked to see if innocent individuals are around before deploying the device, when the police have visually inspected the area where the device will be used and where the police carry a fire extinguisher.

*Escobedo I*, 600 F.3d at 784-85 (citing *United States v. Morris*, 349 F.3d 1012 n.1 (7th Cir. 2003)).

The Estate reads this to mean that a flashbang can be used *only after* the police have had an opportunity to visually inspect the area where it will be used. We believe that the Estate's categorical reading of the language in *Escobedo I* is incorrect (and indeed, we stressed that our ruling in *Escobedo I* was confined to the facts of the case as presented at summary judgment in the light most favorable to the Estate, *see id.* at 786). The considerations enumerated in *Escobedo I* should be construed as a non-exhaustive list of factors for a district court to consider when determining whether the use of a flashbang grenade in a given set of circumstances was appropriate, not a bright-line test in which the absence of any one factor dooms an officer's use of a flashbang as unreasonable. There are many situations where a visual inspection of a room prior to deploying a flashbang is impossible or extremely dangerous, such as when the entrance to a room is barricaded or defended by an armed individual (as occurred here). Reading the

*Escobedo I* factors categorically would mean that police would potentially have to expose themselves to gunfire to visually inspect the area where a flashbang is to be deployed prior to using it. This places officers in a precarious position, and forces them to surrender the very tactical advantages—namely, surprise and temporarily disabling the dangerous individual—they hope to gain by deploying a flashbang.

The facts that emerged at trial indicate that the officers believed that Escobedo was unusually dangerous, as he was hallucinating, high on drugs, and wielding a handgun; the room the team was trying to enter was dark and barricaded; and the doorway itself created a "fatal funnel" through which each officer would have to pass while Escobedo could have shot them. For those reasons, we hold that the facts in this case indicate that the choice to deploy a flashbang without first inspecting the barricaded room into which it was thrown was reasonable, and that Escobedo did not have a clearly established constitutional right to be free from the use of a flashbang.

Indeed, the Estate's own expert, Danaher, conceded that once the team was given the command to enter the apartment, they acted consistent with their training and performed as expected. In reaching its decision to grant qualified immunity to the team members, the district court first found that Escobedo was dangerous and presented a threat to the officers and the public. As Lt. Zelt testified, Escobedo had been suffering from hallucinations of imaginary officers in his apartment,

and those hallucinations made Escobedo dangerous because he could have opened fire at any time. And Danaher agreed that an officer would have to throw the flashbang into the bedroom without first determining where Escobedo was located because the door was barricaded. It was unfortunate that the flashbang landed near Escobedo, but Danaher conceded that there was no way Straub could control where the flashbang landed, and the district court agreed with Danaher's assessment. As we noted above, because the district court found that Escobedo was unusually dangerous, he "did not have a clearly established constitutional right to be free from the use of flashbangs." Thus, the district court did not err when it granted judgment as a matter of law on qualified immunity grounds to Straub for his use of the second flashbang.

**E. The district court did not err when it granted summary judgment in favor of Officers Martin and Brown on the Estate's excessive force claim for shooting Escobedo**

As we noted above, since the Estate is also appealing the district court's grant of summary judgment in favor of Officers Martin and Brown on the use of lethal force, we must consider the facts available to the district court at the summary judgment phase in the light most favorable to the non-moving party (here, the Estate), and ignore the facts that came to light only during the trial. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2007). We review a district court's grant of summary judgment

de novo. *Jordan v. City of Gary*, 396 F.3d 825, 831 (7th Cir. 2005). We have cautioned that

> [t]he award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify. . . . [A] court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statement and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial.

*Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994). However, this does not relieve the Estate of its burden to "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2007) (quotations omitted).

We accept the version of the facts as distilled by the district court in its summary judgment order, *Escobedo v. City of Fort Wayne, et al.*, No. 1:05-CV-424-TS, 2008 U.S. Dist. WL 1971405 (N.D. Ind. May 5, 2008). The record reveals the following: As Westfield, Lee, Straub, Selvia, Brown, and Martin entered the bedroom, they observed that the door had been barricaded with a large bed frame, and the room was dark with poor visibility. During their entry, Escobedo continued to yell that he had a gun and that it was pointed at his head. Officer Martin entered the room last and moved to the right. Martin said he believed that "I was going to get shot or the two guys [Westfield and Lee] were going to probably go down the minute we made entry into that room."

Using his flashlight, Officer Martin saw Escobedo sitting on the ground in the closet with his legs extended in front of him. Escobedo was pointing his gun upside down at his head with his left hand, and the hammer on Escobedo's gun was cocked. Martin announced several times that Escobedo was in the closet and that he was pointing a gun at his own head. Martin then ordered Escobedo to drop his gun several times, and Escobedo began to lower his gun "towards me, pointing it at me." At that point, Martin said he fired because he was in fear of his own life as he was afraid he would be shot or another officer would be shot.

Before Officer Martin opened fire, as Martin pointed his gun and flashlight at Escobedo inside the closet, Officer Brown moved forward, positioning himself to Martin's left. When Sgt. Selvia heard Martin's commands to Escobedo, he yelled for Brown to fire his Sage at Escobedo to disarm him. But "[a]bout the time that came out of my mouth, Officer Martin had already started to shoot." Selvia described Martin shooting and his own command to Brown as "simultaneous."

After the first volley, Escobedo dropped the gun between his legs. Both officers observed Escobedo reach and/or lean forward in an apparent attempt to pick up the gun. Martin said that Escobedo "leaned forward with both hands towards the gun and I felt he was going to pick the gun up and try to shoot." Straub thought that he heard Martin say something such as "don't," or "stop," in between the volley of shots. Martin and Brown then fired a second volley. Martin fired a total of nine or ten

shots during the entire incident, and Brown fired a total of six times. *See generally Escobedo*, 2008 U.S. Dist. WL 1971405, at *15-17.

The Estate contends that material questions of fact exist about whether Escobedo pointed his gun at Officer Martin prior to Martin shooting him. The Estate points out that the Fort Wayne Police Department's test of Escobedo's gun found no latent fingerprints on it. However, this evidence was known to the Estate prior to summary judgment but the Estate did not submit it in its response to the defendants' motion for summary judgment. As the district court correctly held in its order denying the Estate's motion for reconsideration, "the Plaintiff cannot use and the Court cannot consider this evidence . . . because the Plaintiff was able to use it during summary judgment (but chose not to) and it is not 'newly discovered evidence.'" Thus, it cannot be considered when reviewing the district court's grant of summary judgment and its denial of reconsideration. *See Heft v. Moore*, 351 F.3d 278, 281 n.1 (7th Cir. 2003); *see also* Fed. R. App. P. 10(a)(2).

The Estate also argues that there is "substantial circumstantial evidence" that Escobedo did not aim the gun at Officer Martin, highlighting the fact that Escobedo never threatened anyone but himself and the fact that Escobedo repeatedly said that he did not want to hurt anyone. The Estate also points to the deposition testimony of the forensic pathologist who performed Escobedo's autopsy, Dr. Carpenter, to cast doubt on whether Escobedo pointed his gun at the officers. Dr.

Carpenter testified that he could not determine whether Escobedo extended his arm toward Officer Martin or whether his arm was in that position before Martin and Officer Brown began firing. Additionally, the Estate challenges the credibility of the accounts Officers Martin and Brown gave of the shooting. In the post-shooting interview with the Fort Wayne Police Department's Internal Affairs department, Officer Martin said that when Escobedo lowered the gun from his head, he held it six to eight inches from his chest. Officer Brown, however, stated that Escobedo's arm was almost fully extended, approximately one to two feet from his chest.

None of these arguments is availing. The fact that Escobedo did not threaten anyone during the negotiation process does not thereby mean that he did not point the gun at Martin when the team entered his bedroom. It does not contradict Martin's or Brown's accounts of the shooting, and it does not even call it into doubt. Likewise, Dr. Carpenter's deposition testimony does not contradict the accounts of Martin and Brown. It merely states that the autopsy was inconclusive on the position of Escobedo's arm. Finally, the discrepancy in Officer Martin's and Officer Brown's accounts of the shooting regarding how far Escobedo extended his arm from his chest is so minor that it hardly merits consideration. In a dark room filled with tear gas, it would be difficult to ascertain the precise distance at which Escobedo was extending his arm. In short, none of the evidence highlighted by the Estate creates a genuine issue of material fact. Even the most generous reading of these facts in favor of the Estate does not merit a

rejection of the officers' testimony regarding Escobedo's actions during the shooting. The district court correctly observed that the Estate's evidence did nothing more than "highlight minor differences and discrepancies in the Defendants' accounts," which was not sufficient to "survive summary judgment or win a motion to reconsider." For those reasons, we affirm the district court's grant of summary judgment in favor of Officers Martin and Brown on the Estate's excessive force claims.

## III.

For the foregoing reasons, we AFFIRM the jury verdict in favor the defendants, we AFFIRM both the district court's grant of judgment as a matter of law on qualified immunity grounds to Officers Straub, Martin, and Brown, as well as the post-verdict grant to Deputy Chief Bender, Deputy Chief Lucker, Sgt. Hunter, and Lt. Zelt, and we AFFIRM the district court's grant of summary judgment in favor of Officers Martin and Brown on the Estate's excessive force claim.